[No. B156765. Second Dist., Div. One. Feb. 19, 2004.]

HYDRO-MILL COMPANY, INC., Plaintiff and Respondent, v. HAYWARD, TILTON AND ROLAPP INSURANCE ASSOCIATES, INC., et al., Defendants and Appellants.

1146

COUNSEL

Sellar, Hazard, McNeely & Manning, Richard M. McNeely, James Ficence; Sedgwick, Detert, Moran & Arnold, James J. S. Holmes, Douglas J. Collodel and John F. Stephens for Defendants and Appellants.

Lee, Goddard & Duffy, The Duffy Law Firm, Anthony C. Duffy and Jeffrey S. Flashman for Plaintiff and Respondent.

## OPINION

**MALLANO, J.**—A company purchased earthquake insurance from a broker. The broker obtained insurance with less coverage than the company sought. After sustaining damage in the Northridge earthquake, the company submitted a claim under the insurance policy and was paid benefits in accordance with the policy as written.

The company filed this action against the broker to recover the additional benefits that would have been paid under the coverage as requested, alleging causes of action for negligence, breach of oral contract, negligent misrepresentation, and breach of fiduciary duty. The case was tried to the court, which found in the company's favor on all causes of action and awarded compensatory damages, attorneys' fees, prejudgment interest, and costs.

On appeal, the broker contends that the gravamen of this suit, regardless of how the causes of action are labeled, is a claim for professional negligence, and the suit is therefore barred by the statute of limitations applicable to malpractice claims against an insurance broker (Code Civ. Proc., § 339, subd. 1). We agree and reverse.

# I

# BACKGROUND

Plaintiff Hydro-Mill Company, Inc., manufactures sophisticated aircraft parts for the United States military and private aircraft manufacturing companies. It operates facilities at three locations: 9301 Mason Avenue, 9310 Mason Avenue, and 20536 Plummer Street in Chatsworth, California.

On September 30, 1993, Hydro-Mill requested earthquake coverage from its broker, Hayward, Tilton and Rolapp Insurance Associates, Inc. (Hayward). Dan Seymour, an officer of Hayward, and George Lodwick, an officer of Hydro-Mill, discussed the desired coverage with Hydro-Mill's owner. Hayward provided Hydro-Mill with a written tentative "Schedule of Insurance," setting forth Hayward's recommendations as to coverage. The policy was to have an effective date of October 1, 1993.

Hydro-Mill requested earthquake coverage for all three of its locations, including coverage for damage to equipment and building contents, losses related to business interruption, and extra expenses. Hydro-Mill requested that the insurance not cover physical damage to the building structures at 9310 Mason Avenue and 20536 Plummer Avenue because Hydro-Mill leased those premises. The structure at 9301 Mason, which Hydro-Mill owned, was to be covered for physical damage. Hydro-Mill also requested that some of the policy limits be reduced. Seymour made handwritten notations on the Schedule of Insurance to reflect Hydro-Mill's requested changes.

Seymour did not procure the policy himself. He had another Hayward employee, Kathy Crooymans, contact a wholesale insurance broker, Sherwood Insurance Services, and she obtained a policy from Scottsdale Insurance Company. As admitted by Hayward, Crooymans made a mistake in obtaining the policy. For the two leased locations, she did not simply omit coverage for damage to the buildings. She did not obtain coverage of any kind. The owned location was the only one insured. In addition, Crooymans did not obtain extra expenses coverage for any of the locations. (We use the term "owned location" to refer to the property at 9301 Mason Avenue and the term "leased locations" to refer to the properties at 9310 Mason Avenue and 20536 Plummer Street.)

In October 1993, Seymour told Lodwick that Hayward had obtained a policy with all coverages Hydro-Mill requested. In late October 1993, Crooymans received a coverage binder indicating that the owned location was the only one insured. At some point, Hayward received the Scottsdale policy. Hayward did not provide Hydro-Mill with the binder or the policy.

The business interruption provisions in the policy stated that Hydro-Mill was insured "[a]gainst loss resulting directly from necessary interruption of business, or rental value caused by damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, which property is on premises occupied by the insured and *situated as covered herein.*" (Italics added.) Elsewhere, the policy stated that Hydro-Mill had earthquake coverage with a $10 million "[l]oss limit per occurrence on Buildings, Contents, Electronic Data Processing—Hardware and Software, Property of Others and Business Interruption *while situate*: [¶] Loc. # 1: *9301 Mason Ave.*, Chatsworth, CA 91311 . . . ." (Italics added.) The leased locations were not mentioned.

On January 17, 1994, the Northridge earthquake damaged Hydro-Mill's facilities, including its equipment and contents at the owned location and the leased locations. The damage caused interruptions in Hydro-Mill's operations, a reduction in profits, and extra expenses. The work performed at one of the leased locations (9310 Mason Avenue), and the equipment there, had to be moved to the owned location.

Two days after the earthquake, Seymour, Lodwick, and Gene Kopecky, Scottsdale's adjuster, met at Hydro-Mill. Kopecky stated that there might be a problem with coverage because not all of Hydro-Mill's locations were specified in the policy. Upon hearing this, Seymour left the meeting and called his office. Upon his return, Seymour stated that Hayward had made an error by scheduling only the owned location. Kopecky presented a nonwaiver agreement from Scottsdale which stated: "A question exists between the parties hereto as to whether insurance coverage exists . . . by reason of Scottsdale alleging that it may not be liable because of no coverage." Hydro-Mill signed off on the agreement. Lodwick left the meeting knowing there was a problem with coverage as to the leased locations.

Later that same day, Lodwick told Robert Perry, Hydro-Mill's vice-president of operations, about the nonwaiver agreement and the unscheduled locations. Perry threw up his arms and said, "[W]e are not insured." Lodwick and Perry called Seymour, who stated that Hayward had "screwed up" by excluding the leased locations. Two or three days after the earthquake, Seymour advised Hydro-Mill to consider making a demand against Hayward if Scottsdale did not pay the claim in full.[1]

Lodwick was responsible for gathering information to support Hydro-Mill's insurance claim. He worked closely with Kopecky and Richard

---

[1] Seymour so testified at trial. In its appellate brief, Hydro-Mill asserts that Seymour said no such thing, citing two pages of the reporter's transcript. Those pages do not dispute Seymour's testimony.

Azimov, an accountant retained by Scottsdale to assist in adjusting the claim. In May or June 1994, Scottsdale informed Lodwick not to submit any information related to the leased locations because they were not scheduled. Nevertheless, Lodwick provided information as to all three locations, omitting some items as to the leased locations.

On August 31, 1994, Lodwick, Kopecky, and Azimov met at Hydro-Mill to look at the financial aspects of Hydro-Mill's claim and discuss what Kopecky would submit to Scottsdale. As Lodwick knew, the meeting would not have been necessary but for Hayward's failure to obtain coverage for the leased locations. That was the topic of conversation.

Lodwick viewed the meeting as a kind of negotiation about the losses that would be considered for payment. He believed that Hydro-Mill was in a weak position because Hayward had not obtained the coverage requested. Lodwick was "very upset" over the whole situation and believed that Kopecky was focusing on the insurance policy as written.

On December 9, 1994, Kopecky called Lodwick and, on behalf of Scottsdale, offered to pay $270,000 on Hydro-Mill's claim. Kopecky said the offer did not include the losses at the leased locations or any extra expenses regardless of location. Lodwick concluded that Scottsdale would not pay for those losses. But, based on Kopecky's statements, Lodwick believed that Scottsdale had not made a final decision on the issue. Kopecky and Lodwick orally agreed that Scottsdale would pay $270,000 in insurance proceeds in accordance with the policy *as written*, namely, to cover the losses related to the owned location only. After talking to Kopecky, Lodwick contemplated a suit against Hayward.

On December 14, 1994, Lodwick went to Kopecky's office and picked up the check for $270,000. Lodwick signed a "Sworn Statement in Proof of Loss" stating that the "whole loss" caused by the earthquake was in that amount. The payment was intended to settle Hydro-Mill's dispute with Scottsdale as to the owned location. It did not resolve any other claims against anyone.

On October 4, 1995, Lodwick sent a letter to Hayward, stating that Scottsdale had paid $270,000 but had not fully compensated Hydro-Mill for its losses. Lodwick asserted that Hayward was liable for the unpaid sum. Hayward responded by letter dated October 23, 1995, saying: "This will acknowledge receipt of your correspondence dated October 4, 1995, regarding earthquake coverage for your [leased] location at 9310 Mason Avenue. Please be advised that we are in the process of reviewing the matter and anticipate being in a position to respond more fully to your letter shortly."

Hayward contacted its errors and omissions insurer, which assigned an adjuster to the matter. On February 22, 1996, the adjuster wrote to Hydro-Mill, asking for information regarding Hayward's potential liability. Hydro-Mill complied. By letter to Hydro-Mill dated May 9, 1996, the adjuster stated that Hydro-Mill had been properly compensated with the exception of a payment for 9 percent of the cost of a machine.

In mid-January 1997, Hydro-Mill and Hayward executed a stipulation extending Hydro-Mill's time to file a complaint for one month—from January 18, 1997, up to and including February 18, 1997. This action was filed on the last day of the one-month period.

On August 21, 1997, Hydro-Mill filed a second amended complaint (hereafter complaint) naming Hayward, Scottsdale, Seymour, and Crooymans as defendants. Hydro-Mill alleged causes of action for negligence, breach of oral contract, breach of fiduciary duty, injunctive relief, and restitution.

In December 1998, Scottsdale filed a motion for summary judgment, claiming there was no coverage for the leased locations. Hydro-Mill filed opposition papers. The trial court granted the motion. Hydro-Mill filed an appeal, which was dismissed prior to briefing (B132787, Jan. 24, 2000).

The case was tried to the court between January 3 and March 16, 2000. The trial court permitted Hydro-Mill to amend the complaint according to proof, adding a cause of action for negligent misrepresentation.

Hayward, Seymour, and Crooymans (collectively Hayward) moved for nonsuit on the ground that Hydro-Mill's causes of action were barred by the statute of limitations. The trial court denied the motion, concluding that the limitations period had been tolled while Scottsdale processed Hydro-Mill's claim under the policy.

After the close of evidence and submission of the case, the court found in favor of Hydro-Mill. In a statement of decision, the trial court stated that Hayward was liable for negligence, breach of oral contract, negligent misrepresentation, and breach of fiduciary duty; Seymour was liable for negligence, negligent misrepresentation, and breach of fiduciary duty; and Crooymans was liable for negligence and breach of fiduciary duty. Judgment was entered against all defendants, jointly and severally, for $944,033.33 in compensatory damages, plus prejudgment interest, attorneys' fees, and costs.

Hayward filed motions for a new trial and to vacate the judgment, which were denied. A timely appeal followed.

## II

## DISCUSSION

At trial, Hydro-Mill successfully litigated four causes of action, all of which were premised on Hayward's failure to obtain the insurance coverage Hydro-Mill had requested. The causes of action were negligence, breach of oral contract, negligent misrepresentation, and breach of fiduciary duty.

### A. *General Principles of Liability*

"[T]he general rule [is] that an agent or broker who fails to procure insurance as requested will be liable for any resulting damage. . . . [¶] . . . As a general proposition, an insurance agent will be liable to his client in tort where his intentional acts or failure to exercise reasonable care with regard to the obtaining or maintenance of insurance results in damage to the client." (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 909 [274 Cal.Rptr. 186], citation omitted.)

"Insurance agents and brokers have been held liable to insureds or applicants for insurance on a number of theories including breach of contract and professional negligence. . . . Some of the cases arise in the context of an agent who fails to obtain insurance for a client as promised. . . . In other cases, the agent obtains insurance but fails to obtain certain requested coverage . . . or obtains the requested coverage in the wrong amount . . . . In any of these situations, contractual liability of the agent can be at least theoretically premised on the agent's breach of an oral agreement to obtain insurance as requested by the client." (*Saunders v. Cariss, supra,* 224 Cal.App.3d at pp. 908–909, citations and fn. omitted.)

### B. *Applicable Statute of Limitations*

" 'To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the "gravamen" of the cause of action. . . . "[T]he nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code." . . .' " (*Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 874–875 [127 Cal.Rptr.2d 113]; accord, *Smyth v. USAA Property & Casualty Ins. Co.* (1992) 5 Cal.App.4th 1470, 1476 [7 Cal.Rptr.2d 694] (*Smyth*).) "What is significant for statute of limitations purposes is the primary interest invaded by defendant's wrongful conduct." (*Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1207 [51 Cal.Rptr.2d 328].)

### 1. *Professional Negligence*

█ The negligence claim alleges that Hayward, a broker, did not obtain the insurance coverage requested by Hydro-Mill, the insured, and falsely represented to Hydro-Mill that the proper coverage had been obtained. As such, the negligence claim is one for professional negligence and is governed by the two-year statute of limitations set forth in section 339, subdivision 1 of the Code of Civil Procedure (hereafter section 339). (See *Roger E. Smith, Inc. v. SHN Consulting Engineers & Geologists, Inc.* (2001) 89 Cal.App.4th 638, 642–643, 647 [107 Cal.Rptr.2d 424]; *Stark v. Pioneer Casualty Co.* (1934) 139 Cal.App. 577, 582 [34 P.2d 731]; *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1467–1470 [92 Cal.Rptr.2d 521 & fn. 22]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2003) ¶ 12:1136, p. 12D-9 (rev. # 1, 2003); 3 Witkin, Cal. Procedure (4th ed. 1997) Actions, § 576, p. 730; *id.* (2003 supp.) § 576, pp. 141–142.) By its own terms, section 339 applies in "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing . . . ."

### 2. *Breach of Oral Contract*

The cause of action for breach of an oral contract is governed by the same two-year limitations period given that section 339 expressly applies to "[a]n action upon a contract . . . not founded upon an instrument of writing . . . ."

### 3. *Negligent Misrepresentation*

"The elements of negligent misrepresentation are well established. A plaintiff must prove the following in order to recover. '[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage. . . .' " (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983 [132 Cal.Rptr.2d 635].)

"California courts have recognized a cause of action for negligent misrepresentation, i.e., a duty to communicate accurate information, in two circumstances. The first situation arises where providing false information poses a risk of and results in physical harm to person or property. The second situation arises where information is conveyed in a commercial setting for a business purpose." (*Friedman v. Merck & Co.* (2003) 107 Cal.App.4th 454, 477 [131 Cal.Rptr.2d 885].)

With respect to the second situation, which is applicable here, "liability for negligent misrepresentation is imposed only on those who supply information

for ' "business purposes in the course of a business or profession." ' . . . '[M]any familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings." . . .' " (*Friedman v. Merck & Co., supra,* 107 Cal.App.4th at pp. 481–482, citations omitted.) "[T]he basis for liability in misrepresentation by those in the business of providing information is negligence." (*Williams v. Wells & Bennett Realtors* (1997) 52 Cal.App.4th 857, 864 [61 Cal.Rptr.2d 34].)

█ A cause of action for negligent misrepresentation is barred by the two-year statute of limitations (§ 339) where the allegations amount to a claim of professional negligence. (See *Smyth, supra,* 5 Cal.App.4th at pp. 1476–1478; *Ventura County Nat. Bank v. Macker* (1996) 49 Cal.App.4th 1528, 1528–1531 [57 Cal.Rptr.2d 418]; 3 Witkin, Cal. Procedure, *supra,* Actions, § 576, p. 730; *id.* (2003 supp.) § 576, pp. 141–142.)

In *Smyth, supra,* 5 Cal.App.4th 1470, the insured, Theodore Smyth, was sued in a third party action. Smyth tendered the defense of the action to his homeowners insurer, but the insurer refused to defend, stating that he had no existing coverage. Smyth filed suit against the insurer, alleging that it had falsely stated that no coverage was in effect. The complaint contained causes of action for bad faith refusal to defend and negligent misrepresentation. The trial court dismissed the action on demurrer, concluding that the action was barred by the two-year statute of limitations (§ 339). The Court of Appeal affirmed, explaining:

"[T]he complaint alleges that [the insurer] denied the existence of these policies as of February or March 1987, approximately two years and seven months before [the insured] filed the complaint. The trial court properly sustained the demurrer to the bad faith cause [of action] because the complaint was deemed filed well over the two-year statute of limitations for such torts set forth in Code of Civil Procedure section 339, subdivision 1. [¶] . . . [¶]

"The facts sued upon in the cause for 'Negligent Misrepresentation' are the same. [The insured] alleged that [the insurer] repeatedly denied the existence of current policies without exercising reasonable diligence to ascertain the truth of this assertion. The essence of such allegations is that [the insurer] tortiously invaded [the insured's] property right to be secure from the risk of financial loss. Under the facts alleged, the applicable statute of limitations is, again, two years." (*Smyth, supra,* 5 Cal.App.4th at pp. 1477–1478.)

In *Ventura County Nat. Bank v. Macker, supra,* 49 Cal.App.4th 1528, a bank sued a group of accountants for negligent misrepresentation, alleging (1) they had made false representations in an audit report of a company's financial statements, (2) they knew the report would be used by the bank in offering the company a line of credit, (3) they overstated the value of the company, (4) they lacked sufficient information to make representations about the company's financial condition, and (5) the bank relied on the report to its detriment.

In concluding that the claim was time-barred, the Court of Appeal stated: "[T]he essence of this cause of action is negligence, not fraud. [The] allegations show a failure to meet a standard of reasonable care which results in the tortious invasion of a property right. . . . [¶] . . . Negligent misrepresentation is born of the union of negligence and fraud. If negligence is the mother and misrepresentation the father, it more closely resembles the mother." (*Ventura County Nat. Bank v. Macker, supra,* 49 Cal.App.4th at p. 1531.) The court held that section 339 barred the action. (*Ventura County Nat. Bank v. Macker, supra,* 49 Cal.App.4th at pp. 1529–1531.)

■ Here, during trial, Hydro-Mill moved to amend the complaint according to proof in order to add a cause of action for negligent misrepresentation. The trial court granted the motion, stating that the allegations of negligent misrepresentation "would be exactly the same as those of the [complaint], but simply separating." The statement of decision indicates that liability on the misrepresentation claim was based on Hayward's failure to obtain the requested insurance and its false statement that the proper coverage had been obtained—the same facts supporting liability on the claim for professional negligence. In these circumstances, the two-year statute of limitations should apply to both claims.

### 4. *Breach of Fiduciary Duty*

Hydro-Mill contends that a four-year limitations period applies to its cause of action for breach of fiduciary duty (Code Civ. Proc., § 343), making that claim timely. We disagree.

For one thing, it is unclear whether a fiduciary relationship exists between an insurance broker and an insured. " 'A fiduciary relationship has been defined as "any relation existing between parties to a transaction wherein one of the parties is . . . duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the

interest of the other party without the latter's knowledge or consent." . . .' " (*In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 141 [63 Cal.Rptr.2d 894].)

In *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116 [100 Cal.Rptr.2d 246], a commercial property owner, Jack Kotler, was a named insured on his tenant's commercial general liability policy. The tenant, who had purchased the policy through a broker, was to pay the premiums. The policy stated that the insurer would "endeavor" to give Kotler 30 days' notice of cancellation. Without notice to Kotler, the insurer canceled the policy when the tenant failed to make payments. A customer sustained injuries on the property and sued Kotler. He tendered the defense of the action to the insurer, which refused the request on the ground that the policy had been canceled. Kotler filed suit against the insurer and the broker for failure to give notice of the cancellation. The trial court dismissed the action on demurrer, concluding that the defendants had no duty to give notice.

The Court of Appeal reversed the dismissal of the insurer, stating that notice was required by section 677.2 of the Insurance Code, which provides that notice of cancellation of a commercial general liability policy "shall be in writing and shall be delivered or mailed to . . . the named insured . . . ." The court affirmed the dismissal of the broker, stating:

"Kotlar cites no case holding an insurance broker owes a duty of care to a named insured to provide the named insured with notice of the insurer's intent to cancel the policy for nonpayment of premiums. Instead, he asks us to create such a duty. We decline to do so for several reasons.

"In light of our holding section 677.2 imposes a duty on the insurer to notify the named insureds of its intent to cancel the policy we see no purpose in judicially imposing such a duty on a broker.

"Furthermore, the relationship between an insurance broker and its client is not the kind which would logically give rise to such a duty. The duty of a broker, by and large, is to use reasonable care, diligence, and judgment in procuring the insurance requested by its client. . . .

"Kotler's attempt to analogize the broker-client relationship to the attorney-client relationship is wide of the mark. The relationship between an attorney and client is a fiduciary relationship of the very highest character, and attorneys have a duty of loyalty to their clients. . . . Thus, while an attorney must represent his or her clients zealously within the bounds of the law . . . , a broker only needs to use reasonable care to represent his or her client." (*Kotlar v. Hartford Fire Ins. Co., supra*, 83 Cal.App.4th at p. 1123, citations omitted.)

Indeed, our Supreme Court has held that an *insurer* is not a fiduciary, stating: "The insurer-insured relationship . . . is not a true 'fiduciary relationship' in the same sense as the relationship between trustee and beneficiary, or attorney and client. . . . It is, rather, a relationship often characterized by unequal bargaining power . . . in which the insured must depend on the good faith and performance of the insurer . . . . This characteristic has led the courts to impose 'special and heightened' duties, but '[w]hile these "special" duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because the insurer *is* a fiduciary.' " (*Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1150–1151 [113 Cal.Rptr.2d 70, 33 P.3d 487], italics in original; see Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 11:146 to 11:158, pp. 11-32 to 11-33 (rev. # 1, 2003).) If an insurer is not a fiduciary, then arguably, neither is a broker.

But in *Eddy v. Sharp* (1988) 199 Cal.App.3d 858 [245 Cal.Rptr. 211], the court commented in dicta that "[i]f an insurance agent is the agent for several companies and selects the company with which to place the insurance or insures with one of them according to directions, the insurance agent is the agent of the insured. . . . Where the agency relationship exists there is not only a fiduciary duty but an obligation to use due care." (*Id.* at p. 865, citations omitted.)

Whether or not the broker-insured *relationship* is a fiduciary one, a broker still has certain fiduciary *duties*. For example, "[a]ll funds received by any person acting as an insurance agent[] [or] broker . . . as premium or return premium on or under any policy of insurance . . . are received and held by that person in his or her fiduciary capacity. Any such person who diverts or appropriates those fiduciary funds to his or her own use is guilty of theft and punishable for theft as provided by law." (Ins. Code, § 1733; see also *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042 [102 Cal.Rptr.2d 673] [brokers found liable for breach of fiduciary duty where they failed to obtain insurance at best available price].)

As one leading treatise has observed: "It is not clear in what respect the 'fiduciary duty' owed by an independent insurance agent differs from the duty of due (reasonable) care. As used in respect to an independent agent, 'fiduciary duty' may refer merely to avoidance of conflict of interest, self-dealing, excessive compensation, etc." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 11:166, p. 11-34 (rev. # 1, 2003).)

■ As stated, the applicable statute of limitations is determined by—as variously phrased—the nature of the right sued upon, the primary interest

affected by the defendant's wrongful conduct, or the gravamen of the action. (*Marin Healthcare Dist. v. Sutter Health, supra,* 103 Cal.App.4th at pp. 874–875; *Barton v. New United Motor Manufacturing, Inc., supra,* 43 Cal.App.4th at p. 1207.) Here, the complaint shows that the allegations of professional negligence subsume all of the allegations for breach of fiduciary duty. The statement of decision indicates that liability on both of those causes of action is based on the same findings: Hayward failed to obtain the requested insurance coverage and did not disclose that failure. In short, Hydro-Mill's causes of action, regardless of appellation, amount to a claim of professional negligence. Because a two-year statute of limitations governs that type of claim (§ 339), Hydro-Mill cannot prolong the limitations period by invoking a fiduciary theory of liability.

Our conclusion finds support in *Curtis v. Kellogg & Andelson* (1999) 73 Cal.App.4th 492 [86 Cal.Rptr.2d 536]. There, an accounting firm gave tax advice to a corporation about the amount of compensation to be paid to a particular employee and also prepared tax returns listing that information. The Internal Revenue Service conducted an audit, determined that the compensation exceeded a reasonable allowance, and required the corporation to pay back taxes plus penalties and interest.

In an action against the accounting firm, the complaint alleged that the corporation was never advised that the employee's compensation was excessive, nor did the firm inform the corporation of the erroneous nature of that advice. The complaint alleged causes of action for professional negligence, breach of fiduciary duty, and breach of contract. The trial court dismissed the action as untimely based on the statute of limitations.

In affirming the dismissal, the Court of Appeal first examined the professional negligence claim, concluding that it was barred by the two-year limitations period (§ 339). The court continued: "The same analysis renders [the corporation's] claims . . . for breach of fiduciary duty[] . . . and breach of contract untimely. Since the gravamen of the breach of contract and breach of fiduciary duty claims [is] the purported malpractice, the two-year statute of limitations applies." (*Curtis v. Kellogg & Andelson, supra,* 73 Cal.App.4th at p. 503; see *Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362, 1366–1369 [12 Cal.Rptr.2d 354] [in professional negligence action against attorney, plaintiff cannot circumvent one-year statute of limitations applicable to legal malpractice claim by alleging cause of action for breach of fiduciary duty].)

In sum, because the gravamen of this lawsuit is Hayward's failure to execute its obligations as an insurance broker, the two-year limitations period

for professional negligence applies to the cause of action denominated "breach of fiduciary duty," rendering it untimely.[2]

## C. *Commencement of the Statute of Limitations*

" 'Civil actions, without exception, can only be commenced within the periods prescribed in [sections 312 to 366.3 of the Code of Civil Procedure], after the cause of action shall have accrued . . . .' On certain causes of action the law in California has evolved to a point where the limitations clock begins to run only 'when the injured party *discovers or should have discovered* the facts supporting liability.' . . . California 'generally now subscribe[s] to the view that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.' " (*Butcher v. Truck Ins. Exchange, supra,* 77 Cal.App.4th at p. 1468, italics added, citation omitted.)

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises . . . .' . . . In other words, it sets the date as the time when the cause of action is complete with all of its elements . . . —the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury' . . . ." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79], citations omitted; accord, *Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803, 810–811 [97 Cal.Rptr. 164]; *Walker v. Pacific Indem. Co.* (1960) 183 Cal.App.2d 513 [6 Cal.Rptr. 924].)

"In a professional malpractice context, accrual of the cause of action does not await the plaintiff's discovery that the facts constituting the wrongful act or omission constitute professional negligence, i.e., the plaintiff's discovery that a particular legal theory is applicable based on the known facts. If one has suffered appreciable harm and knows or suspects that professional blundering is its cause, the fact that the professional has not yet advised the plaintiff [of the mistake] does not postpone commencement of the limitations period." (3 Witkin, Cal. Procedure (2003 supp.) Actions, § 693, pp. 192–193; accord, *Norgart v. Upjohn Co., supra,* 21 Cal.4th at p. 398, fn. 2; *Apple Valley Unified School Dist. v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934, 942 [120 Cal.Rptr.2d 629]; *Curtis v. Kellogg & Andelson, supra,* 73 Cal.App.4th at pp. 501–503.)

---

[2] Hydro-Mill contends that, in the trial court, the parties stipulated to the existence of a fiduciary relationship between Hayward and Seymour, on the one hand, and Hydro-Mill, on the other hand. Hayward and Seymour assert there was no such stipulation. As the foregoing discussion demonstrates, we need not resolve that issue.

"A cause of action for professional negligence does not accrue until the plaintiff (1) sustains damage and (2) discovers, or should discover, the negligence." (*Roger E. Smith, Inc. v. SHN Consulting Engineers & Geologists, Inc., supra,* 89 Cal.App.4th at pp. 650–651.) It does not matter here that the damages or losses attributable to the earthquake may have increased over time. "It is the fact of damage, rather than the amount, that is the relevant consideration. . . . Consequently, the [insured] may suffer 'appreciable and actual harm' before he or she sustains all, or even the greater part, of the damages occasioned by the professional negligence." (*Van Dyke v. Dunker & Aced* (1996) 46 Cal.App.4th 446, 452 [53 Cal.Rptr.2d 862], citation omitted.) Thus, the crucial question in this case is when did Hydro-Mill know, or when should it have known, about Hayward's wrongful conduct and the resulting harm.

The event giving rise to Hydro-Mill's insurance claim—an earthquake—was sudden, brief, and of sufficient magnitude to raise immediate concerns about extensive property damage. As Hydro-Mill states in its appellate brief:

"The Earthquake caused significant damage to Hydro-Mill's operating facilities and equipment at [the owned location] and [one of the leased locations], including physical damage to . . . equipment, contents, and other property belonging to Hydro-Mill at both [locations]. . . .

"The Earthquake further caused crippling disruptions and interruptions in Hydro-Mill's business operations . . . . [¶] . . . [¶] . . . The Earthquake stopped operations at [one of the leased locations], where the company had operated an extremely large, specialized equipment known as the Super Center, used to produce inner fan ducts for military aircraft. . . . [¶] . . . [¶] . . . Hydro-Mill had to abandon [that location] . . . and move the Super Center to the [owned] facility . . . . That move not only entailed considerable expense, but also required Hydro-Mill to build a new foundation for the Super Center and to disconnect and remove several other machines that had been used for other, principally private contractor jobs at [the owned facility].

"Those dislocated machines also ceased operations for a considerable period, costing Hydro-Mill significant revenues . . . ." In short, Hydro-Mill knew about the damage to its equipment and operations within hours after the earthquake.

Hydro-Mill also learned fairly quickly that Hayward's mistake would result in harm. On January 19, 1994, two days after the earthquake, Seymour admitted that Hayward had "screwed up" by not insuring the leased locations, causing Hydro-Mill's vice-president of operations to say, "[W]e are not insured."

In May or June 1994, Scottsdale informed Lodwick that Hydro-Mill's claim should exclude items related to the leased locations. On August 31, 1994, Lodwick attended a meeting with Scottsdale's adjuster and accountant to discuss the problem created by Hayward's error in placing the insurance. It appeared to Lodwick that the adjuster was focusing on the insurance policy as written, not the coverage requested. Lodwick was "very upset" at the time.

On December 9, 1994, Scottsdale offered to pay $270,000 on Hydro-Mill's claim, making clear that the losses related to the leased locations were being excluded. In response, Lodwick thought about filing suit against Hayward. On December 14, 1994, Lodwick picked up the check at Kopecky's office and signed a "Sworn Statement in Proof of Loss" stating that the "whole loss" caused by the earthquake was in that amount.

The trial court concluded that the statute of limitations began to run on December 9, 1994. Nevertheless, it ruled that the running of the limitations period as to Hayward, the *broker*, was tolled until Scottsdale, the *insurer*, denied Hydro-Mill's claim in writing. That denial did not occur until Scottsdale filed its answer to the complaint in this action.

We agree with the trial court that the limitations period began to run on December 9, 1994. But, as discussed below, we decide that the statute of limitations was not tolled as to Hayward while Scottsdale processed Hydro-Mill's claim.

Thus, Hydro-Mill had to file suit on or before December 9, 1996. It did not do so. This action was filed on February 18, 1997. And although the parties agreed to extend the limitations period for one month—from January 18, 1997, up to and including February 18, 1997—that agreement did not affect the earlier, December 9, 1996 deadline. Taking the agreement into account, Hydro-Mill filed this action one month late, such that it is time-barred unless subject to tolling or some other equitable theory.

D. *Tolling the Statute of Limitations*

In an action by an insured against an insurer, the statute of limitations is tolled "from the time the insured files a timely notice, pursuant to policy notice provisions, to the time the insurer formally denies the claim in writing." (*Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 678 [274 Cal.Rptr. 387, 798 P.2d 1230] (*Prudential-LMI*).)

This tolling principle applies to contractual limitations provisions in an insurance policy as well as statutory provisions like section 339. (See *Prudential-LMI, supra,* 51 Cal.3d at pp. 678, 691–693; *Aliberti v. Allstate Ins.*

*Co.* (1999) 74 Cal.App.4th 138, 145–146 [87 Cal.Rptr.2d 645]; *Forman v. Chicago Title Ins. Co.* (1995) 32 Cal.App.4th 998, 1002–1004 [38 Cal.Rptr.2d 790]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 6:120, 6:120.1, 6:121.6, 12:1123, 12:1154, 12:1160, pp. 6A-24, 6A-25, 12D-6 to 12D-7, 12D-12, 12D-13.) "It would be 'unconscionable' to permit the limitations period to run while the insured is pursuing its rights in the claims process, as required by the policy." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 6:121, p. 6A-24 (rev. # 1, 2002), citing *Prudential-LMI, supra*, 51 Cal.3d at p. 690.)

As our Supreme Court has explained, the tolling principle furthers public policy: "First, it allows the claims process to function effectively, instead of requiring the insured to file suit *before* the claim has been investigated and determined by the insurer. Next, it protects the reasonable expectations of the insured by requiring the insurer to investigate the claim without later invoking a technical rule that often results in an unfair forfeiture of policy benefits. Although an insurer is not required to pay a claim that is not covered or to advise its insureds concerning what legal arguments to make, good faith and fair dealing require an insurer to investigate claims diligently before denying liability. . . . Third, a doctrine of equitable tolling will further our policy of encouraging settlement between insurers and insureds, and will discourage unnecessary bad faith suits that are often the only recourse for indemnity if the insurer denies coverage after the limitation period has expired." (*Prudential-LMI, supra*, 51 Cal.3d at p. 692, italics in original.)

As one Court of Appeal has noted, "the need to resolve such evidentiary conflicts [concerning when the insured learned that the insurer had denied a claim] is entirely eliminated by requiring the insurer to deny a claim clearly and unequivocally in writing. Doing so places little or no burden on the insurer, which obtains in return the certainty of knowing that the equitably tolled period has ended." (*Aliberti v. Allstate Ins. Co., supra*, 74 Cal.App.4th at p. 149.)

In the present case, the insurer, Scottsdale, never notified Hydro-Mill in writing that the insurance claim had been resolved one way or the other. As a consequence, the statute of limitations as to Scottsdale was tolled until it filed an answer in this litigation. From this, Hydro-Mill jumps to the conclusion that the statute of limitations was also tolled as to Hayward, a *broker*, in the same way. Not so.

The tolling permitted under *Prudential-LMI, supra*, 51 Cal.3d 674, is based on factors specific to the processing of an insured's claim. The insurance policy requires an insured to submit a timely claim, which is then investigated by the insurer. It would make little sense to require an insured to file

suit against an insurer before the investigation is completed and the insured notified of the result. Nor should an insured be penalized for deferring litigation unless and until the insurer has *denied* the claim. If the claim is ultimately paid, the parties and the courts are all the better for it.

In contrast, Hydro-Mill's claim against Hayward did not involve the processing of a claim. When Seymour announced that Hayward had "screwed up" two days after the earthquake, there was no need for an investigation. All of the elements of a cause of action against Hayward—wrongful conduct, causation, and harm—were satisfied *no later than* December 9, 1994, when Scottsdale offered a payment that excluded the losses on the leased locations and all extra expenses. Hayward had agreed to obtain coverage for those items but failed to so.

Nor does public policy support the tolling of an action against a broker based on whether and when an insurer denies a claim in writing. The broker has no control or influence over that process. In this case, for example, the insurer did not give written notice before the insured filed suit. But the broker admitted fault early on. It would be inequitable to hold that the statute of limitations against an insurance broker is tolled indefinitely if an insurer never denies a claim in writing.

■ Our conclusion recognizes that the relationships among insureds, insurers, and brokers give rise to different duties that, in turn, are subject to different statutes of limitations. For example, under the California standard form fire insurance policy, the insured has one year from the date of inception of the loss to file suit against the insurer, but the one-year period is tolled while the insurer processes the claim. (See *Prudential-LMI, supra*, 51 Cal.3d at pp. 678, 693; Ins. Code, § 2071.) Thus, if the insured—without unnecessary delay—gives notice of a claim one month after the date of inception of the loss, and the insurer denies the claim in writing, the insured would have to sue the insurer within 11 months after the denial. But the insured would have two years to bring a negligence claim against a broker for failing to obtain the proper coverage, and the limitations period would begin to run when the insured discovered or should have discovered the facts supporting liability. (See *Stark v. Pioneer Casualty Co., supra*, 139 Cal.App. at p. 582; *Butcher v. Truck Ins. Exchange, supra*, 77 Cal.App.4th at pp. 1467–1470 & fn. 22.)

E. *Waiver of the Statute of Limitations*

As provided by law, "[i]n pleading the Statute of Limitations it is not necessary to state the facts showing the defense, but it may be stated generally that the cause of action is barred by the provisions of Section ____ (giving the number of the section and *subdivision thereof*, if it is so divided,

relied upon) of the Code of Civil Procedure; and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing that the cause of action is so barred." (Code Civ. Proc., § 458, italics added.)

Here, the applicable statute of limitations—section 339, subdivision 1—provides that a two-year limitations period governs "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing . . . ." In the answer, Hayward properly cited section 339 but did not specify any subdivision. Hydro-Mill contends Hayward thereby waived the statute of limitations as a defense. We conclude otherwise.

As our Supreme Court stated almost a century ago: "Subdivision 1 of the section in question [(§ 339)] was the only provision thereof that could by any possibility be applicable to this case. Subdivision 2 relates to actions against sheriffs, coroners, and constables, and subdivision 3 to actions [based upon the rescission of a contract not in writing]. No demurrer was interposed to the answer, which, for the purposes of the trial, was assumed to sufficiently present the defense, and the court made its findings thereon. Under these circumstances, we are satisfied that the attempt to plead subdivision 1 of section 339 should not be treated as a nullity, and that the objection to the manner of pleading it was waived by the failure of plaintiffs to urge such objection in the trial court." (*Churchill v. Woodworth* (1906) 148 Cal. 669, 676 [84 P. 155]; accord, *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1086, fn. 5 [1 Cal.Rptr.2d 215].)

■ This action involves the same circumstances as *Churchill v. Woodworth*, *supra*, 148 Cal. 669. Thus, Hayward did not waive the statute of limitations as a defense.

## F. *Estoppel to Raise the Statute of Limitations*

"A defendant 'cannot escape the consequences of [its] acts or conduct affirmatively engaged in to procure delay for purposes of settlement, or investigation or otherwise, upon which the [plaintiff] has relied and by which he has been induced to delay the filing of a claim until after the expiration of the statutory period. Such conduct, so relied upon, becomes the basis of an estoppel against the party responsible for the delay . . .' . . . .

"But '[b]efore an estoppel to assert an applicable statute of limitations may be said to exist, certain conditions must be present: "[T]he party to be estopped must be apprised of the facts; the other party must be ignorant of the true state of facts, the party to be estopped must have intended that its conduct be acted upon, or so act that the other party had a right to believe

that it was so intended; and the other party must rely on the conduct to its prejudice." . . .' " (*Muraoka v. Budget Rent-A-Car, Inc.* (1984) 160 Cal.App.3d 107, 116 [206 Cal.Rptr. 476]; accord, *Vu v. Prudential Property & Casualty Ins. Co., supra*, 26 Cal.4th at pp. 1152–1153.)

In response to Lodwick's October 4, 1995 letter to Hayward, accusing it of malpractice, Hayward's errors and omissions insurer assigned an adjuster to review the matter. The adjuster contacted Hydro-Mill by letter dated February 22, 1996, requesting information about Hayward's alleged wrongdoing. On May 9, 1996, the adjuster wrote Hydro-Mill, denying liability on Hayward's part but noting that Hydro-Mill was due an insignificant sum.

On appeal, Hydro-Mill argues that the adjuster's review of the dispute estops Hayward from relying on the statute of limitations. We reject that argument. With respect to the adjuster's review, Hydro-Mill does not (1) point to any fact known by Hayward of which Hydro-Mill was unaware, (2) mention any act taken by Hayward with the intention that Hydro-Mill rely upon the act in delaying suit, or (3) contend it relied on Hayward's conduct to its prejudice. No evidence is cited for any of these necessary conditions.

In a similar vein, Hydro-Mill emphasizes that the adjuster's May 9, 1996 letter addressed the statutes of limitations, stating: "We take this opportunity to advise you that under California law, there are certain time limitations within which a lawsuit must be filed. If a lawsuit is not properly commenced within the allowed time, your right to bring suit may be jeopardized. The time period limitation is referred to under the law as the statute of limitations.

"In California, the statute of limitations for bringing a lawsuit for personal injuries is one year. The statute of limitations for bringing a lawsuit for property damage is three years. A lawsuit based on contract must be commenced within four years, within two years if not based upon a written contract. Other time limitations may apply, some of them shorter, depending on your particular situation. The date from which this time period begins depends on the specific circumstances of each case, but is generally from the date of loss.

"You should be aware of this time period and the effect it may have on the claim you are making. If you have any questions about the statute of limitations on your specific claim, you may want to consult an attorney."

Focusing on the foregoing language, Hydro-Mill states in its appellate brief that the adjuster's letter "was written during a time when [Hayward] remained in a fiduciary relationship to Hydro-Mill. [¶] [Hayward] induced Hydro-Mill on [its] agent's representation regarding a three year limitations

period. [Hayward] should be estopped from now relying on a two year statute, contrary to that representation."

There are two problems with Hydro-Mill's contention. First, the letter did not advise Hydro-Mill to wait three years to file suit. Rather, the letter mentioned various limitations periods, including the two-year statute of limitations (§ 339); stated that "other time limitations may apply, some of them shorter"; and recommended that Hydro-Mill consult an attorney in that regard. Second, Hydro-Mill does not cite any evidence that it relied on the contents of the letter in bringing suit.

## G. Revival of Stale Insurance Claims

In the wake of the Northridge earthquake, the Legislature enacted section 340.9 of the Code of Civil Procedure (hereafter section 340.9), which states: "Notwithstanding any other provision of law or contract, any insurance claim for damages arising out of the Northridge earthquake of 1994 which is barred as of the effective date of this section solely because the applicable statute of limitations has or had expired is hereby revived and a cause of action thereon may be commenced provided that the action is commenced within one year of the effective date of this section."

■ Section 340.9 revives an action against an *insurer* based on an *insurance policy*, not a suit against a *broker* for *malpractice*. "The legislative history reveals 'allegations of widespread abuse by insurers who . . . may have committed numerous acts of bad faith by denying the legitimate claims of potentially thousands of Northridge earthquake victims.' . . . The 'companies repeatedly low-balled claims, failed to inform policyholders of their benefits and forced many claimants to sue to get full payment.' . . . 'According to the author, [section 340.9] seeks to provide these individuals, who . . . were victimized twice (once by the earthquake and a second time by their insurance companies) with a reasonable "second chance" to seek redress for their damages.' . . . Inclusion of tort claims in section 340.9 furthers the legislative purpose that victims obtain damages for their insurers' misconduct. 'The availability of tort remedies in the limited context of an insurer's breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage' . . . . [¶] Finally, the Legislature contemplated that the new law would revive claims barred by the insurance policies' one-year limitations provision . . . ." (*20th Century Ins. Co. v. Superior Court* (2001) 90 Cal.App.4th 1247, 1279–1280 [109 Cal.Rptr.2d 611], citations omitted.)

Thus, section 340.9 does not revive Hydro-Mill's tardy action against its *broker*, Hayward, or the broker's employees, Seymour and Crooymans.

## III

## DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in favor of Hayward, Tilton and Rolapp Insurance Associates, Inc., Dan Seymour, and Kathy Crooymans. The parties are to bear their own costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

Respondent's petition for review by the Supreme Court was denied May 12, 2004.