OPINION OF THE COURT
Fuchsberg, J.
This case for libel, brought by Dominic S. Rinaldi, now a retired New York State Supreme Court Justice, against Viking Penguin, Inc.,[1] the publisher of a book entitled “The Abuse of Power”, and its coauthors Jack Newfield and Paul Du Brul, in the main requires us to consider (1) whether, under the relevant circumstances, there can be said to have been a republication of the book sufficient to start the applicable one-year Statute of Limitations running anew (CPLR 215, subd 3) and (2) the standards by which summary judgment may be applied in a public figure libel litigation in determining the existence of actual malice.
*428 The issues come to us in the context of two appeals, now consolidated. Each arises from a single order of the Appellate Division, which, on the law, modified Special Term’s order denying the publisher’s and the authors’ separate motions for summary judgment and granting plaintiff’s cross motion to dismiss defendants’ affirmative defense of the Statute of Limitations. The modification granted summary judgment to the authors,, but otherwise affirmed (73 AD2d 43). The Appellate Division thereafter granted the publisher leave to appeal on a certified question, which, in its usual broad form, asks whether its ruling against this defendant was proper (CPLR 5602, subd [b]). For his part, aggrieved by so much of the ruling as favors the authors, plaintiff appeals as a matter of right (CPLR 5601). On the analysis which follows, we believe the result reached at the Appellate Division' was correct in all respects.
The facts on which the determinations rest may be said to have begun on May 13, 1977, when Penguin released a hard-cover edition of the book to the general public. Among this work’s contents, in a section introduced by a topical sentence which speaks of “organized crime’s domination of New York City’s politics and judges”,[2] appeared the following language: “Individual mobsters have had access to individual politicians and judges * * * And some judges appear to display generosity toward organized crime defendants * * * Supreme Court Justice Dominic Rinaldi has twice personally gone to police stations to release alleged Mafioso Santo Patti, who had twenty prior gambling arrests, rather than wait for Patti to be arraigned before another judge the next morning. Police records show that Justice Rinaldi did this on April 18, 1969, and again on June 5,1970. But no crime has ever been proven against Corso or Rinaldi. The secret connections between Mafia dons and politicians and judges are raw meat for gossip and television drama. But the element of legal proof seems lacking, although we *429 would not be surprised if it were discovered tomorrow by an interprising prosecutor” (emphasis added).
Within a week, Justice Rinaldi had written to the publisher protesting that the emphasized language was false, and demanding both its retraction and its elimination from any unissued copies or future printings. In this and other correspondence in which he and the publisher engaged shortly thereafter, he specifically stated, among other things, that he had never been to a police station to sign a release on a bail bond; that the police records did not bear out the book’s assertion that he had; that the bonds he did sign, standard ones in misdemeanor cases, were in the form approved by the State Superintendent of Insurance; that he and other Judges in the same position were required to sign them in such cases in normal course; and that he never met or heard of Santo Patti and was not even familiar with his name when he signed the bonds.
The responses from Viking and its counsel in sum acknowledged that there had been “factual error”, but offered to do no more than delete the reference to going to police stations, amends which Justice Rinaldi was to reject as inadequate. In justification for its position, the publisher also indicated that it had had a right to rely on the authors and that Mr. Newfield, who had been the one to write the passages in question, in turn had relied on an article which had appeared in the New York Times some two years earlier.
But Justice Rinaldi, in addition to insisting that the Times story itself had been neither fair nor faithfully followed in “The Abuse of Power”, maintained that, in context, “[t]he book publishes the statements not contained in the Times article, that I went to the police station to sign these bonds, and that this was done because individual mobsters have had access to me and because of the secret connections between the Mafia dons and judges and that by reason thereof, I committed some yet unproven crime”. On that note, his last words to Viking’s lawyers, on September 8, 1977, read, “It is now clear to your client and to you, that these statements as to me, based on my signing of these bonds of Santo Patti, are false, and that if your *430 client persists in its position, it does so with knowledge of such falsity”. Despite, or perhaps because of, the plaintiff’s firm views, Viking’s senior editor admits that, almost contemporaneously, she wrote a note “to be placed in the corrections file which would be organized in preparation for any subsequent printing of the Book.” The note itself has never been produced.
The scene.then shifts to the spring of 1978, when, having found the book far less successful than anticipated, the publisher, after having printed 20,000 copies for hard-cover use, found itself with about 10,000 unsold ones. About 5,400 of these had never even been bound. It was at this juncture that the publisher decided to market a paperback edition, in the course of whose production it would consume or convert the unbound and hardbound materials it had on hand.
This it had accomplished by May, 1978. The paperbacks so produced received, inter alia, new covers, a new publisher’s name (“Penguin Books” in place of “Vanguard Press”), a revised title page updating the publication from 1977 to 1978 and a copyright page memorializing new identifying numbers, including ones assigned by the Library of Congress. In addition, newly imprinted data indicated that the book was to be published simultaneously in foreign countries by diverse Penguin Books entities, mostly corporate in form. In the process, the hard covers on the some four-thousand-odd copies that had been left over from the initial publication were ripped off and two new pages substituted by hand. The changes necessary to recycle the previously unbound pages directly into paperbacks were even more extensive; a so-called “signature”, consisting of the first 32 pages of each unbound copy, was reprinted in its entirety. Yet, the matter which had elicited plaintiff’s indignation was left unchanged, nothing being deleted or rewritten to conform to the editor’s offer and “note”, much less to plaintiff’s prescription for repairing the harm. In the face of this event, plaintiff commenced this action, over a year from the time the hard-cover edition came out, but only two months from the time when the soft-cover copies first appeared.
*431 It was essentially on this record that Special Term, passing on the motions, found that the books had been “substantially modified”, that the marketing of the paperbacks was an “independent act” rather than part of a “continuous publication” and that, as a consequence, the time within which the suit could be brought was to be measured from the issuance of the paperbacks and not the hard covers. Stressing that the plaintiff had put the defendants on notice that the “original publication was inaccurate and defamatory”, nisi prius also concluded that the plaintiff had made a sufficient demonstration of the existence of actual malice to resist summary judgment, all the more so when there had been no opportunity for discovery.[3]
Only on the disposition as to the authors did the Appellate Division overrule Special Term. On that score, while Special Term would go no further than to suggest that subsequent disclosure might reveal that the authors had too little “input in the publication of the paperback edition to subject them to liability”, the Appellate Division arrived at a fixed conclusion that, since the authors had no say in the decision to publish the paperbacks, which alone were the subject of plaintiff’s suit, the republication of the offending statement was not an act for which Messrs. Newfield and Du Brul could be faulted. However, the Appellate Division agreed that, in putting out the paperbacks, the publisher had “held this out as a new edition or publication, a reissue, and it does have that effect for purposes of the statute of limitations”. Moreover, as to the requisite showing of actual malice, quoting from Trails West v Wolff (32 NY2d 207, 219), it too felt that there was sufficient showing that “the defendant in fact entertained serious doubts as to the truth” of the statement to require “further exploration of the facts”.
Against this factual and decisional background, treating first with the Statute of Limitations issue, we at once focus, *432 as have all the parties, on Gregoire v Putnam’s Sons (298 NY 119), in which this court for the first time applied what has come to be known as the “single publication rule” to a book libel suit. Building on Wolfson v Syracuse Newspapers (254 App Div 211, affd without opn 279 NY 716), Gregoire marked a pronounced turnabout from the common law’s “multiple publication rule” which had held largely undisputed sway following the handing down of the historic English decision in Duke of Brunswick v Harmer in 1848 (14 QB 185,117 Eng Rep 75). These cases point the way for us now.
Brunswick’s suit was based on a newspaper story circulated in 1830. Over 17 years later in September, 1847, the Duke’s servant purchased a back copy of the original edition at the newspaper’s office. The prevailing Statute of Limitations, if measured from the time when the edition of which the copy was a part came out, long since would have run. The court, making no new law in the process, nevertheless held the sale of the back copy in 1847 was an independent publication from whose date the statutory period began to run all over again. As a result, the action was not barred, and the Duke recovered on a by then 18-year-old libel. However inconsonant with the policy of repose behind limitations statutes, the effect of the Brunswick decision was so pervasive that, at the dawning of Gregoire and Wolf son nearly a hundred years later, the Restatement confidently reported that in prevailing American law “each time a libelous book or paper or magazine is sold, a new publication has taken place which, if the libel is false and unprivileged, will support a separate action for damages against the seller” (Restatement, Torts, § 578, Comment b [1938]).
Departing from this doctrine, Gregoire expanded on a developing theory under which the activities reasonably related to the production and distribution of a newspaper or magazine were regarded as part of a single transaction against which the statute would run from the time that the original circulation of the periodical, no matter how large or widespread, had taken place (see Wolfson v Syracuse Newspapers, 254 App Div 211, supra; Means v Mac *433 Fadden Pub., 25 F Supp 993, 994). Sensitive to the realities of a society in which mass distribution and nationwide communication now are norms, and antithetical to the almost unending potential for unbarred stale claims under Brunswick’s multiple publication approach, Gregoire made clear that neither the. time nor the circumstance in which a copy of a book or other publication finds its way to a particular consumer is, in and of itself, to militate against the operation of the unitary, integrated publication concept.
This is not to say that, for Statute of Limitations purposes, all of a publisher’s subsequent activities relating to a particular book or periodical are swallowed up in the publishing event which first launches it, for all practical purposes the position the publisher urges on us. Gregoire’s holding is not so all-embracing or so simple. Its reference to “one publication which gives rise to one cause of action” is expressly tied to “a single issue of a newspaper, or a single issue of a magazine” (emphasis added; Gregoire v Putnam’s Sons, supra, at p 123). Indeed, two cases the opinion distinguished but did not overrule confirmed for recognized scholars that a repetition of the defamation in a later edition could still give rise to a new cause of action. (Mack, Miller Candle Co. v MacMillan Co., 239 App Div 738, affd 266 NY 489 [newspaper]; Cook v Conners, 215 NY 175 [book]; Lañar, Single Publication Rule, 25 Rocky Mt L Rev 263, 267; Prosser, Interstate Publication, 51 Mich L Rev 959, 962). The balance so struck limited the exposure of publishers without untoward unfairness to those they might defame.
Moreover, the Gregoire court furnishes its own illustrations of the kind of case in which the principle it articulated was to have its primary application. First, of course, was the case then at hand. It emanated from a publisher’s sale from stock of a copy of the book containing the libelous language. Since this transaction occurred two years after the book had last undergone a printing and general distribution, the issue was whether the last printing or the later sale from stock was to be the point of departure for the running of the statute. Qualitatively reminiscent of the back issue sold in Brunswick, the sale from stock here was *434 one of only a trickle of 60 to which dwindling demand for the book had reduced such sales in the 12 months preceding initiation of suit. Thus, on its facts, Gregoire merely held that, in a Brunswick-type case involving a book, the Statute of Limitations is not to be reactivated by a late sale from the residue of a time-barred publishing event.
Secondly, in extending the reach of Wolf son to books, the Gregoire court adopted the rationale of the Appellate Division’s decision in that case. The latter court was vigorous in its declaration that the statute would be stultified if “although a book may have had but one publication twenty years ago, if the publisher continues to make unsold copies of the single publication available to the public today, by sale or otherwise, such conduct amounts to a republication of any libel which the book contains” (Wolfson v Syracuse Newspapers, 254 App Div 211, 213, supra). Obvious is Gregoire’s concern for the Statute of Limitations frustrations typified by Brunswick.
Finally, Wolf son’s own facts evidence the self-same preoccupation. There, too, the alleged libel was one outlawed by the passage of time if calculated from the date when the edition of the daily newspaper in which it appeared was published. But, as in Gregoire, the plaintiff argued that a time bar so measured would not be apropos because his cause was not founded on the original publication but on a recent and timely reading of the allegedly tainted text in an old copy kept on file in the newspaper’s reading room, where it was available for the perusal of the public. Once again, what was most pronounced about the court’s rejection of this contention was its repudiation of the classical Brunswick theory.
From all this, both the expounded law and the undisputed facts, the bringing out of the paperbacks unquestionably was that of a new edition and, as such, a republication. It flowed from a conscious and deliberate decision to prepare and distribute nearly 10,000 such copies, a number approximately equivalent to the equally substantial quantity of hardbacks which earlier had been introduced into the channels of commerce. It would appear to be immaterial that, in creating the paperbacks, or even in *435 deciding whether and when to do so, the publisher may have taken into account the fact that in the process it might be able to incorporate, adapt, convert or otherwise make use of the oversupply of books created by its miscalculation of the responsiveness of the hard-cover market. Economic factors of this kind, be they the desire to put available funds, or personnel, or manufacturing facilities, or, as in this case, salvageable goods to work are commonplace cost accounting considerations in business decision-making.
By no means was this to be but a delayed circulation of the original edition. Whatever reediting, repricing, reprinting, restyling, rebinding, redistributing, republicizing, re-registering, reidentifying or recovering took place, these were directed to the new project. We also observe that, to the hard-cover edition’s copyright page notation that the book was published by Viking in 1977, the publisher in the paperback version added the unqualified words “Published in Penguin Books 1978”. We therefore agree that the publisher’s affirmative defense of the Statute of Limitations was properly stricken as a matter of law.
On the related subject of whether the authors participated or acquiesced in the publication of the paperbacks, it was their submission on the motion for summary judgment that they had no knowledge of and played no role in either the decision to issue a paperback edition or in its implementation. This the publisher concedes and the plaintiff does not contradict. Even more to the point, the authors’ position is supported by undisputed documentary proof. For, examination of the authors’ contract with the publisher, which forms part of the record on this appeal, reveals that the publisher was not required to obtain the authors’ consent, notify them of its intention or even consult them on the project. The authenticity of this writing is unquestioned. The Appellate Division, therefore, correctly recognized that, on the threshold publication issue, it had no option but to dismiss the case against the writers (see Karaduman v Newsday, Inc., 51 NY2d 531, 540).
We turn then to the correctness of the ruling on the publisher’s motion for summary judgment, made essentially on the “actual malice” issue. Since this is a public *436 figure case, the motion was to be weighed by the requirements, now firmly decreed to be the law of the land, that, to “encourage comment on and criticism of those charged with public office”, before such a suitor may recover not only must it appear that the implicated defamatory falsehood was uttered with actual malice, but also that the burden of so demonstrating has been met by the plaintiff with “convincing clarity”[4] (New York Times Co. v Sullivan, 376 US 254, 275, 285-286). Regard must be had too for the fact that “malice”, a term which, as used in its First Amendment constitutional sense, is not to be equated with a base or unworthy motive (see Greenbelt Pub. Assn. v Bresler, 398 US 6, 10), but instead is to be defined as “ ‘knowledge [of falsity or] reckless disregard of whether it was false or not’ ” (Wolston v Reader’s Digest Assn., 443 US 157, 160).
On the issues these principles control, the things the parties dispute are (1) whether on the facts plaintiff presented, viewed most favorably to the plaintiff, a reasonable jury could find that actual malice had been proved with convincing clarity, (2) whether the possible chilling of First Amendment rights by libel litigation should incline courts to favor summary judgment as “the best procedural protection for freedom of speech” (Maguire v Harriscope Broadcasting, 6 Media L Rptr 1257 [Wyo, 1980]), and (3) whether the determination of the motion should await the outcome of the suspended discovery.
On the first of these subissues the publisher, inter alia, relies on arguments that plaintiff’s own assertion of the falsity of the alleged libel is not enough to meet the clear and convincing standard; that the publisher’s reliance on the authors who, in turn, relied on the New York Times article, negates any “high degree of awareness of * * * probable falsity” (Garrison v Louisiana, 379 US 64, 74); that whether plaintiff signed the bonds in the police station or in the courthouse is not material; and that the failure of the “correction” note to reach those who prepared the paperbacks was due merely to a nonmalicious, and pre *437 sumably nonreckless, lack of communication between the editor and production personnel.
To these, plaintiff responds that his own affidavit, far from standing alone, is corroborated by one from the insurance company’s representative attesting to the fact that its bonds were signed in court; that he had supplied a detailed and objectively verifiable analysis of the applicable law to support the propriety of his conduct; that he had provided an equally verifiable description of the procedure, long and uniformly followed by all Judges of the large Brooklyn court in which he sat, as a means by which the regularity of his own performance could be tested; that, while the publisher’s reliance on the authors could stand it in good stead as to the hardbacks, it could no longer serve that purpose when, well before the paperback edition was undertaken, the plaintiff’s letter of complaint had alerted it to specific inaccuracies (cf. Rinaldi v Holt, Rinehart, & Winston, 42 NY2d 369, 383); and that whether the plaintiff gave favored treatment to Santo Patti by repairing to the police station or whether he had routinely and impersonally passed on the bonds in court was a vital element in raising the libelous text’s innuendos that the Judge was at the beck and call of notorious members of organized crime. Also emphasized by the plaintiff, and crucial to the decision here, is the fact that, on independent investigation of his complaints, the publisher itself concluded that at least some part of the material to which he had objected indeed was inaccurate. Pointing out that though, in consequence, the publisher had informed the. plaintiff that appropriate corrections would be made in future publications, directions to that effect were never given to those who would be charged with the task of implementing such a decision, circumstances which, at least in combination, were sufficient to warrant a trial on the issue of malice.
On the second subissue, i.e., whether summary judgment should be the “rule” (see Oliver v Village Voice, 417 F Supp 235, 237; see, also, Rosenbloom v Metromedia, Inc., 403 US 29, 52-53), plaintiff points to the Supreme Court’s recent expressions of disapproval of the widespread use of summary judgment in public figure defamation cases. *438 In what may be a swing of the pendulum the other way, the court observed that, since “ [t]he proof of ‘actual malice’ calls a defendant’s state of mind into question”, such a case “does not readily lend itself to summary disposition” (Hutchinson v Proxmire, 443 US 111, 120, n 9; see, also, Wolston v Reader’s Digest Assn., 443 US 157, 161, n 3, supra; cf. Herbert v Lando, 441 US 153, 174-175; see, also, Yiamouyiannis v Consumers Union of U. S., 619 F2d 932, cert den 49 USLW 3247; National Nutritional Foods Assn. v Whelan, 492 F Supp 374; Berkey v Delia, 287 Md 302; National Assn. of Governmental Employees v Central Broadcasting Corp., — Mass —, 396 NE2d 996 [Mass], cert den 446 US 935).
Finally, on the discovery point, the publisher, urging that the record is complete and that discovery will add nothing, asks for adjudication in its favor. The plaintiff, respondent on the publisher’s appeal, accurately noting that it had not delayed its demand for discovery, particularly with respect to the issue of malice, requests that the publisher’s motion for summary judgment be “denied in any event under CPLR 3212 (f)”, which permits denial in contemplation of discovery. This comports with the thinking of the Appellate Division, and we see no reason to disturb it. It also makes it unnecessary for us to finally pass on the first two subissues at this state of the development of the case.
Accordingly, the order of the Appellate Division should be affirmed in all respects, with costs to the plaintiff against the defendant Viking on the latter’s appeal and costs to the defendants Newfield and Du Brul on plaintiff’s appeal, and the question certified should be answered in the affirmative.

. Penguin Books was also named as a defendant. However, according to Viking Penguin, Penguin Books is not a legal entity, but only a trade name or “imprint” under which Viking Penguin publishes paperback books.

. After a long career as a Judge, the plaintiff retired on December 31, 1977. The matter on which his complaint is grounded was originally published on May 13,1977. However, when suit was commenced in July of 1978, it was premised on the assumption that the circulation of the material contained in the paperbacks only two months earlier, i.e., in May, 1978, was a republication..

. Defendants served discovery notices with their answers. Plaintiff immediately filed cross notices. But before discovery could proceed, it was automatically stayed by defendants’ motions for summary judgment. Thereafter, auxiliary to its grant to the publisher of leave to take its present appeal, the Appellate Division continued the stay “subject to modification by the Court of Appeals”.

. “Convincing clarity” and “clear and convincing” are used interchangeably in the case law on this subject.