Anna Maria **ALBERGHETTI,** Bonnie Pointer, and Judy Tenuta, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

**CORBIS CORPORATION,** Defendant.

No. CV 09–5735 SVW (CWX).

United States District Court, C.D. California.

April 29, 2010.

Arthur S. Gold, Gold & Coulson, Jay B. Ross, Jay B. Ross & Associates PC, Chicago, IL, Brian J, Robbins, Kevin A. Seely, Robbins Umeda LLP, San Diego, CA, for Plaintiff.

Henry Z. Carbajal, III, Fenwick and West, Mountain View, CA, Laurence F. Pulgram, Kathryn J. Fritz, Leslie A. Kramer, Fenwick and West, San Francisco, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [73]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs allege that Defendant violated their common law and statutory rights of publicity by using Plaintiffs' images, names, and likenesses without Plaintiffs' permission. Plaintiffs also allege an unjust enrichment cause of action premised on the same underlying facts as the publicity rights claims.

Defendant moves for summary judgment on the ground that Plaintiffs' claims are time-barred by California's two-year statute of limitations governing publicity rights actions. As described below, Defendant is entitled to summary judgment on all of Plaintiffs' claims.

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. PLAINTIFFS' ALLEGATIONS [1]

Plaintiffs, Anna Maria Alberghetti and Bonnie Pointer, are artists/entertainers

1. The following factual summary is drawn from the Court's Order Denying Plaintiffs' Motion for Class Certification. These facts are presented solely for purposes of context

who have worked in a variety of mediums.[2] Plaintiffs are both California residents. (Compl. ¶¶ 7–8.) Defendant Corbis Corporation is a photo-licensing company incorporated in Nevada and headquartered in Washington state.

On its website, Defendant provides a catalog of roughly five million photographs available to its users. The website's users can purchase a license to use copyrights for those photographs. Plaintiffs allege that their photographs and names are included in this online catalog. Plaintiffs allege that Defendant's users are able to type search terms (such as names) into the website, which sorts the files according to the user's search. Plaintiffs further allege that Defendant itself has taken efforts to match individuals' names with their photographs.

As part of the copyright licensing agreement it sells to its users, Defendant notifies its licensees that they are only licensing the copyright to use the image and that the buyer may have to obtain the additional rights in order to display and use the images. Defendant's agreement specifically notes that licensees may have to obtain licenses to use the photo subjects' rights of publicity.

The essence of Plaintiffs' Complaint is that Defendant is infringing Plaintiffs' rights by providing a searchable catalog of its photo database. This catalog uses Plaintiffs' names and images to advertise the underlying product offered by Defendant (copyright licenses). Thus, Plaintiffs assert that Defendant infringes their rights of publicity because Defendant's use of their names and images helps Defendant sells its photo copyright licenses to its users.

In its answer, Corbis admits that it "has displayed photographic works in which Plaintiffs appeared on Corbis' Website for the purposes of selling copyright licenses." (Answer ¶ 22.) It also admits "that the names of Plaintiffs may be used in the search toolbar on Corbis' Website to locate those works." (*Id.*) Corbis admits that it "has sold copyright licenses for some of those works" in which Plaintiffs' appeared. (*Id.* at ¶ 21.) Corbis further admits that it "charges a varying rate for the license of each work depending on its intended end-use." (*Id.* at ¶ 20.)

## B. PROCEDURAL HISTORY

The Court previously denied Defendant's Motion to Dismiss. Defendant sought to preempt Plaintiffs' publicity rights claims on the basis of Copyright preemption. On October 28, 2009, the Court denied Defendant's Motion to Dismiss the Complaint for failure to state a claim. [Docket no. 34.] The Court held that Plaintiffs' rights of publicity were legally distinct from Defendant's copyrights and were therefore not preempted by federal copyright law. The Court noted that in a publicity rights action like the present one, "the object that is 'fixed in a tangible medium of expression' is the physical likeness and persona of the Plaintiffs. Name, likeness, and persona are not copyrightable subject matter, both under the Copyright Act and the Copyright Clause of the Constitution. A name, likeness, or persona is not a work of 'authorship' entitled to copyright protection." [Order at 8–9.] The Court also held that Defendant's actions, as alleged in the Complaint, were not protected by the First Amendment because "Plaintiffs allege that Defendant's use 'is not connected with any news, public

---

and are not the operative facts for the present Motion for Summary Judgment.

**2.** Judy Tenuta was formerly a Plaintiff in this action, but per the parties' stipulation and the Court's December 10, 2009 Order, she has been dismissed without prejudice.

affairs, sports broadcast or account, or any political campaign.'" [Order at 12–13, quoting Compl. ¶ 24.]

Plaintiffs then filed a Motion for Class Certification. On January 13, 2010, the Court denied Plaintiffs' Amended Motion for Class Certification. [Docket no. 61; published as *Alberghetti v. Corbis Corp.,* 263 F.R.D. 571 (C.D.Cal.2010).] The Court noted that Plaintiffs and their counsel disagreed over whether the class should include non-entertainers and whether the class should primarily seek monetary damages or injunctive relief. [Order at 11–23.] The Court accordingly held that Plaintiffs failed to satisfy the Rule 23(a)(4) "adequacy" requirement because "[b]etween the two Plaintiffs and their counsel, there are three different conceptions of what the class should include and what relief it should seek." [Order at 18.]

In the present Motion, Defendant is seeking summary judgment on the ground that Plaintiffs' claims are time-barred by California's two-year statute of limitations.

## C. DEFENDANT'S UNCONTESTED FACTS

For purposes of the Motion for Summary Judgment, Defendant has presented the following uncontested facts. Plaintiffs introduce a single piece of evidence in opposition.

Defendant Corbis owns and licenses copyrights to various visual works to a variety of end users, including periodicals for editorial uses, book publishers, and other news media outlets including television or other video outlets. (SUF 1.) In connection with its licensing activity, Corbis displays its copyrighted photographs on its websites, including www.corbisimages.com and www.corbisoutline.com, in the form of an online digital catalog. (SUF 2.) When Corbis receives digital images from its various image sources, it creates several different digital files with different image resolutions for each image. These different digital files include an identical image and do not differ in terms of subject matter, image cropping, colorization, or anything other than image resolution. (SUF 3.)[3] After these files are created, Corbis makes the images available on its website catalog for its users to view and purchase licenses. Once the files for an image are created and made available in its catalog, the image files are not subsequently altered. (SUF 4.)

Users of the Corbis website can view the online catalog, select the copyrighted image they would like to license and, after registering on the Corbis website, acquire a license to use the copyrights and obtain a copy of the image. (SUF 5.) To license a Corbis image, a user can search for an image on the Corbis website. Once the user finds an image it wants to license, it selects the image dimensions it wants to license from the available pre-created files for that image. (SUF 6.) If the user wishes to complete the purchase, the user selects from the pre-created files for that particular image. The user then informs Corbis about the intended use of the image, the size of the use, the industry, and other identifying information. Once the license transaction is completed, the licensed image is immediately downloadable by the user. (SUF 7.) The Corbis end-user license agreement used is a standardized agreement, rather than one negotiated on an individual customer basis, and it is available on the Corbis website.[4] Corbis

---

3. Defendant analogizes the different image sizes and resolutions to "a published book being available in regular and large-size print versions." (SUF 3.)

4. In relevant part, Corbis's licensing agreement provides:

All Content may be subject to copyrights, trademarks, **rights of publicity,** moral

has not revised this standard end-user licensing agreement since June 2005. (SUF 8.)

Plaintiff Anna Maria Alberghetti appears in, or her name is associated with, twenty-one different images in the Corbis catalog. Each of these images was first made available on Corbis's website more than two years prior to the filing of this action on August 5, 2009.[5] (SUF 9.) Plaintiff Bonnie Pointer appears in, or her name is associated with, nine different images in the Corbis catalog. Each of these images was first made available on Corbis's website more than two years prior to the filing of this action on August 5, 2009.[6] (SUF 10.)

Corbis has sold ten licenses that include Plaintiffs' image or name. All of the licenses were governed by Corbis's standard End–User License. (SUF 11.) Nine of the ten images were sold without any modification at all. (SUF 12.) In the tenth image, sold on March 8, 2005, Corbis created a higher-resolution file at the customer's request. (MacLean Decl. ¶ 17.)

In opposition, Plaintiffs submit a copy of a deposition transcript from a related action. (Gold Decl., Ex. 1.) The deposition testimony was given by one of Corbis's in-house attorneys.[7] The deposition does not contradict Defendant's Statement of Uncontroverted Facts, but merely provides additional detail regarding Uncontroverted Fact number seven: "The user then informs Corbis about the intended use of the image, the size of the use, the industry, and other identifying information." (SUF 7.) The deposition testimony merely repeats this Uncontroverted Fact while providing greater detail about Corbis's approach to pricing its products.

## III. LEGAL STANDARD

### A. SUMMARY JUDGMENT

Rule 56(c) requires summary judgment for the moving party when the evidence,

---

rights, property rights or other rights **belonging to another party. You are solely responsible for determining whether Your use of any Content requires the consent of any other party or the license of any additional rights,** and You should not rely solely on the information provided by Corbis. **You are solely responsible for obtaining any and all releases and clearances as may be required,** including without limitation (a) rights from any representative guild, union, professional organization, or other authorized representative; and (b) if any music is included in the Content, master use, synchronization and performance licenses from the copyright proprietors of the applicable master recording(s) and composition(s) and such other persons, firms or associations, societies or corporations as may own or control the performing rights thereto. If You are unsure whether additional rights are needed for Your use, You are responsible for consulting with competent legal counsel. No employee or representative of Corbis may make, and You shall not rely upon, any representations or warranties other than those stated herein.

(MacLean Decl., Ex. B. at 12, ¶ 10, emphasis added.)

5. Specifically, images including Alberghetti's name or likeness were published on Corbis's website on the following dates: October 3, 1997 (SUF 25), November 6, 1997 (SUF 16), December 21, 1999 (SUF 30–32), March 10, 2000 (SUF 20), May 2, 2000 (SUF 28), June 8, 2000 (SUF 17–19), August 2, 2000 (SUF 34), November 16, 2001 (SUF 14), March 22, 2002 (SUF 26), March 28, 2003 (SUF 27), August 31, 2003 (SUF 29), September 4, 2003 (SUF 33), February 8, 2005 (SUF 21–23), and August 3, 2006 (SUF 15).

6. Specifically, images including Pointer's name or likeness were published on Corbis's website on the following dates: March 17, 1998 (SUF 37–42), July 21, 1998 (SUF 36), February 6, 2001 (SUF 43), and October 10, 2001 (SUF 35).

7. There are no facts in the record identifying the deponent (*see* Gold Decl.), but Plaintiffs' legal memorandum refers to the deponent as a "Corbis associate general counsel." (Opp. at 6.)

viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may satisfy its Rule 56(c) burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer,* 198 F.3d 1130, 1134 (9th Cir.2000). Only genuine disputes "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party" over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## B. STATUTE OF LIMITATIONS UNDER CALIFORNIA LAW

■ California's common law and statutory publicity rights are governed by a two-year statute of limitations. Cal. Civ. Code § 3425.3. The statute of limitations begins to run from the initial "publication" of the allegedly infringing writing or image.

The Uniform Single Publication Act[8] is codified in California law as Cal. Civ.Code § 3425.3. In full, the law provides:

No person shall have more than one cause of action for damages for libel or slander or **invasion of privacy or any other tort** founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

Cal. Civ.Code § 3425.3 (emphasis added).

This statute, known as the "single publication rule," governs the present action. The plain language of the statute encompasses actions for privacy torts, and the California Supreme Court has expressly held that it also applies to torts for commercial misappropriation of likeness. *Christoff v. Nestle USA, Inc.,* 47 Cal.4th 468, 476–77, 97 Cal.Rptr.3d 798, 213 P.3d 132 (2009).

■ This statute of limitations also applies to internet publications. In the internet context, the statute of limitations be-

---

**8.** The Uniform Single Publication Act, first published in 1952, is one of the less successful attempts at creating a uniform body of state laws. As of 2005, only seven states have adopted the Uniform Single Publication Act. *See Uniform Single Publication Act* § 1, "Table of Jurisdiction Wherein Act Has Been

Adopted" (2005 ed.). However, "the great majority of the remaining states follow the single-publication rule by judicial decision." *Christoff v. Nestle USA, Inc.,* 47 Cal.4th 468, 479 n. 8, 97 Cal.Rptr.3d 798, 213 P.3d 132 (2009) (internal quotation omitted).

gins to run when the allegedly infringing material is first posted on the internet. *See Canatella v. Van De Kamp,* 486 F.3d 1128, 1134–36 (9th Cir.2007), *cert. denied,* 552 U.S. 1041, 128 S.Ct. 669, 169 L.Ed.2d 513 (2007) (discussing federal law); *Oja v. U.S. Army Corps of Eng'rs,* 440 F.3d 1122, 1130–31 & nn. 5–10 (9th Cir.2006) (discussing federal law and collecting cases from various jurisdictions); *Traditional Cat Ass'n, Inc. v. Gilbreath,* 118 Cal.App.4th 392, 394, 13 Cal.Rptr.3d 353 (2004) (discussing California law); *Long v. Walt Disney Co.,* 116 Cal.App.4th 868, 870, 873–75, 10 Cal.Rptr.3d 836 (2004) (same).

■ The single publication rule prevents any meaningful application of the "discovery rule," which usually provides that a cause of action only begins to run from the time that the plaintiff knew or reasonably should have known that the cause of action had accrued. *See Christoff,* 47 Cal.4th at 482–83, 97 Cal.Rptr.3d 798, 213 P.3d 132; *Shively v. Bozanich,* 31 Cal.4th 1230, 1237, 7 Cal.Rptr.3d 576, 80 P.3d 676 (2003). In contrast to the discovery rule, under the single publication rule the statute of limitations begins to run immediately upon the publication's initial distribution to the general public. *Shively,* 31 Cal.4th at 1237, 7 Cal.Rptr.3d 576, 80 P.3d 676. This rule is nicely illustrated by the California Supreme Court's decision in *Hebrew Academy of San Francisco v. Goldman,* 42 Cal.4th 883, 70 Cal.Rptr.3d 178, 173 P.3d 1004 (2007). In that case, the plaintiff sued for defamatory remarks contained in a transcribed oral history. "Fewer than 10 copies of the transcripts of these interviews were published." *Id.* at 888, 70 Cal.Rptr.3d 178, 173 P.3d 1004. The transcripts were available in a handful of academic libraries, religious libraries, and the New York Public Library. *Id.* at 889, 70 Cal.Rptr.3d 178, 173 P.3d 1004. The court held that this limited method of publication and distribution was sufficient to start the clock on the statute of limita-

tions. *Id.* at 894, 70 Cal.Rptr.3d 178, 173 P.3d 1004. The court distinguished the interview transcript from cases involving a publication "in an inherently secretive manner" that keeps the "defamatory statement hidden from view," such as a statement contained "in a personnel file that generally cannot be inspected by the plaintiff." *Id.* at 893–94, 70 Cal.Rptr.3d 178, 173 P.3d 1004 (internal quotations omitted). The court concluded that "although not widely distributed, the transcript was available to the public Because plaintiffs in the present case had access to the document from the time it was published, the discovery rule does not apply." *Id.* at 894–95, 70 Cal.Rptr.3d 178, 173 P.3d 1004.

Because the discovery rule does not apply, the most important issue surrounding the single publication rule involves determining "what constitutes a single integrated publication" to which the rule applies. *Christoff,* 47 Cal.4th at 477, 97 Cal.Rptr.3d 798, 213 P.3d 132 (internal quotations omitted). A series of cases illustrate the contours of the distinction between a "single integrated publication," in which the statute of limitations begins to run from the initial distribution, and a "re-publication" of a different "issue" or "edition" of the work, in which the statute of limitations restarts upon the most recent publication.

On one end of the spectrum, the single publication rule does not apply to re-publications in new editions or new issues. For example, a plaintiff may file a suit related to the publication of a *paperback* edition of a book even if the statute of limitations would bar a suit over the publication of the original *hardcover* edition. *Kanarek v. Bugliosi,* 108 Cal.App.3d 327, 166 Cal. Rptr. 526 (1980). Even if the two editions are "identical in form and content," the paperback version is "undoubtedly intended to and d[oes] reach a new group of

readers," and is therefore a new publication for purposes of the statute of limitations. *Id.* at 333, 166 Cal.Rptr. 526.

More clearly if the different editions *are not* "identical in form and content," the single-publication rule does not apply. In such cases, the new publication is neither a "single publication" nor even a "re-publication"—it is an entirely different publication, to which the single publication rule plainly does not apply. The obvious example is when a newspaper publisher prints Monday's newspaper on Monday and Friday's newspaper on Friday. *Cf. Belli v. Roberts Brothers Furs,* 240 Cal.App.2d 284, 49 Cal.Rptr. 625 (1966). The statute of limitations begins to run on Monday with respect to the content in Monday's paper and it begins to run on Friday with respect to the content in Friday's paper.

A more nuanced example of a "new publication" can be found in *Miller v. Collectors Universe, Inc.,* 159 Cal.App.4th 988, 72 Cal.Rptr.3d 194 (2008). The plaintiff, an expert authenticator of collectible autographs, sued an autograph-authentication company for using the plaintiff's name without the plaintiff's permission. The defendant had used plaintiff's name on approximately 14,000 certificates authenticating various autographs. The court concluded that each authentication certificate constituted a separate publication for purposes of the statute of limitations because each certificate contained materially different content. *Id.* at 998–99, 72 Cal.Rptr.3d 194.

The parties in the present action debate *Miller* because the facts of *Miller* are unusually subtle: the only differences between the 14,000 authentication certificates were that they contained different serial numbers. However, as noted by the *Miller* court, the serial numbers were the *central piece of information* on each certificate: "the purchaser of the certificate could use that serial number to ac-

cess a description of the corresponding authenticated article on Collectors website." *Id.* at 998–99, 72 Cal.Rptr.3d 194. Because of the nature of the business—the users would purchase a unique serial number that provided them access to the unique authentication-related information they were seeking to obtain—the only meaningful content on the authentication certification was the serial number itself. Accordingly, the defendant's sale of 14,000 certificates with 14,000 different serial numbers was functionally equivalent to a publisher selling 14,000 different daily editions of its newspaper over 14,000 days.

On the other end of the spectrum, the single-publication rule applies to all the copies of a particular press run. Most obviously, if a publisher produces a single hardcover edition of a book that is printed over a period of months, the various printings of that edition constitute a single publication. *Fleury v. Harper & Row, Publishers, Inc.,* 698 F.2d 1022, 1027–28 (9th Cir.1983), *overruled on other grounds by Matter of McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). Similarly, if a publisher prints a book in a single press-run and sells the leftover stock many years later, the statute of limitations begins to run at the time the first copy was printed and distributed, not the time that the excess stock was re-sold. *Christoff,* 47 Cal.4th at 480, 97 Cal.Rptr.3d 798, 213 P.3d 132 (citing *Gregoire v. G.P. Putnam's Sons,* 298 N.Y. 119, 81 N.E.2d 45 (1948)).

In a slightly more difficult example, if six *substantially identical* editions of a newspaper are published over an eight-hour period, the cause of action "accrues upon the first general distribution of the publication to the public." *Belli v. Roberts Brothers Furs,* 240 Cal.App.2d 284, 286, 289, 49 Cal.Rptr. 625 (1966). In *Belli,* the publisher printed an early "race edition," two-star, three-star, and four-star "final

editions," and a pair of "home editions" every day. *Id.* at 286, 49 Cal.Rptr. 625. All of the editions were deemed to be a single publication for purposes of the statute of limitations. *Id.* at 289, 49 Cal.Rptr. 625.

As these cases suggest, there is no clear boundary between single, discrete publications that are protected by the first publication rule, and re-publications that are not protected by the rule. The California Supreme Court was recently faced with a particularly challenging application of this issue in *Christoff v. Nestle USA.* In *Christoff,* the plaintiff's photograph had been used for years on "Taster's Choice" coffee cans and advertisements. The coffee-can label featuring the plaintiff had first been printed in 1998 and the plaintiff did not file suit until 2003. 47 Cal.4th at 473, 97 Cal. Rptr.3d 798, 213 P.3d 132. Unfortunately, the court declined to determine whether defendant's re-printing of the same label over many years constituted a single "discrete publishing event." *Id.* at 481–82, 97 Cal.Rptr.3d 798, 213 P.3d 132. The court explained that the record was insufficient to support a satisfactory analysis of the question because the trial court's erroneous pretrial ruling had prevented the parties from introducing relevant facts. *Id.* at 482, 97 Cal.Rptr.3d 798, 213 P.3d 132.

In a concurring opinion, Justice Werdegar identified a helpful set of "general principles" that bear on the issues that the other Justices had refrained from addressing. Justice Werdegar disapproved of other states' cases holding that "multiple broadcasts, distributions or displays of identical material constitute a single publication for purposes of the statute of limitations, and not a series of republications." *Id.* at 484, 97 Cal.Rptr.3d 798, 213 P.3d 132. Instead, he approved of the view that "each broadcast or display [i]s a separate publication, or republication, each of which, if it violates the plaintiff's rights, begins a

new limitations period." *Id.* For example, if an advertiser re-broadcasts a commercial twenty-two years after its initial broadcast, Justice Werdegar would hold that the later broadcast restarts the statute of limitations. *Id.* at 485, 97 Cal. Rptr.3d 798, 213 P.3d 132 (distinguishing *Zoll v. Jordache Ents., Inc.,* No. 01 Civ. 1339(CSH), 2002 WL 31873461 (S.D.N.Y. Dec. 24, 2002)).

Justice Werdegar provided a useful analytical tool for synthesizing the seemingly inscrutable precedents from across the country: "A useful distinction lies in earlier cases' criterion of a republication decision that is 'conscious and independent' or 'conscious and deliberate.'" *Id.* at 485, 97 Cal.Rptr.3d 798, 213 P.3d 132 (internal alterations omitted) (quoting *Barres v. Holt, Rinehart & Winston, Inc.,* 131 N.J.Super. 371, 330 A.2d 38, 46 (1974), *aff'd,* 74 N.J. 461, 378 A.2d 1148 (1977)); *Rinaldi v. Viking Penguin, Inc.,* 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377, 382 (1981). Accordingly, whenever a defendant makes a "conscious, deliberate choice to continue, renew or expand [its] use" of infringing material, the statute of limitations starts anew. *Id.* at 486, 97 Cal. Rptr.3d 798, 213 P.3d 132.

Most relevantly, Justice Werdegar proposed a clear rule for cases "where there [is] no initial mass printing, but [instead] individual copies or small batches of copies [are] printed and sent out to readers on demand." *Id.* at 485, 438 N.Y.S.2d 496, 420 N.E.2d 377. He explained that, where content is available on demand on the internet, "each instance of access to text [or other content] on the Internet is not considered a separate publication, nor presumably would be each download of text in digital form to an electronic reader or audio device." *Id.* at 485, 438 N.Y.S.2d 496, 420 N.E.2d 377 (citing *Firth v. State,*

184 Misc.2d 105, 706 N.Y.S.2d 835, 841–43 (N.Y.Ct.Cl.2000)). He continued:

> Where the publisher has set up a more or less automated system for printing and distributing an item or for downloading it in digital form and does not make a separate publishing decision as to each copy or small batch of copies, to call each such distribution a new "issue" of the material would defeat the purposes of the single publication rule. Conversely, where a publication has been out of print or unavailable in digital form for some time and the publisher makes a conscious decision to reissue it or again make it available for download, no reason appears in the text or purposes of section 3425.3 why the publisher should not be separately responsible for any tort committed in republishing.

*Id.* (citing *Firth,* 706 N.Y.S.2d at 843).

■ Although Justice Werdegar's concurrence is non-precedential dictum, the Court finds his synthesis to be relevant and persuasive. In cases where "the state's highest appellate court has not decided the question presented," a federal court sitting in diversity "must predict how the state's highest court would decide the question." *Orkin v. Taylor,* 487 F.3d 734, 741 (9th Cir.2007) (citing *Ticknor v. Choice Hotels Intern., Inc.,* 265 F.3d 931, 939 (9th Cir.2001)). Justice Werdegar's concurrence offers the best available prediction as to how the California Supreme Court would ultimately rule on this issue,[9] particularly in light of the fact that it is in accord with the views of the intermediate California appellate courts on this issue. *See, e.g., Traditional Cat Ass'n,* 118 Cal. App.4th at 402–03, 13 Cal.Rptr.3d 353; *Long,* 116 Cal.App.4th at 873–75, 10 Cal. Rptr.3d 836.

## IV. DISCUSSION

### A. STATUTE OF LIMITATIONS AND THE SINGLE PUBLICATION RULE

As the previous legal summary suggests, the single publication rule can present thorny legal questions. The *facts* presented in the case at bar, however, do not implicate the subtle contours of the single publication rule. It is simply undisputed that Defendant did not alter, adjust, or otherwise republish Plaintiffs' names and images after August 2007. Instead, prior to August 2007, Defendant created a set of images and placed them on its website for its users to view and download. Prior to August 2007, Defendant posted Plaintiffs' images, used Plaintiffs' names, and set up a fully automated process that allowed its users to view and download images that allegedly infringe Plaintiffs' publicity rights.

■ It is well-established that the act of posting material on the internet constitutes a "publication" for purposes of the statute of limitations. *See, e.g., Canatella,* 486 F.3d at 1134–36; *Oja,* 440 F.3d at 1130–31 & nn. 5–10; *Traditional Cat Ass'n,* 118 Cal.App.4th at 394, 13 Cal. Rptr.3d 353; *Long,* 116 Cal.App.4th at 870, 873–75, 10 Cal.Rptr.3d 836; *Yeager v. Bowlin,* No. CIV. 2:08–102 WBS (JFM), 2010 WL 95242, at *12–14 (E.D.Cal. Jan. 6, 2010). It is also well-established that the posted content constitutes a "single publication" for purposes of the single publication rule as long as it is not later removed and re-posted or otherwise materially altered. *See, e.g., Canatella,* 486 F.3d at 1134–36; *Oja,* 440 F.3d at 1130–31 & nn. 5–10; *Traditional Cat Ass'n,* 118 Cal. App.4th at 394, 13 Cal.Rptr.3d 353; *Long,*

**9.** Notably, none of the California Supreme Court Justices refuted the reasoning in Justice Werdegar's concurrence.

116 Cal.App.4th at 870, 873–75, 10 Cal. Rptr.3d 836; *Yeager*, 2010 WL 95242, at *12–14.

▆ Here, it is undisputed that Defendant posted the allegedly infringing materials prior to August 2007. Accordingly, it is likewise undisputed that Defendant's use of Plaintiffs' names and images constitutes a "single publication" for purposes of the statute of limitations. The two-year statute of limitations therefore bars Plaintiffs' claims.

Plaintiffs attempt to argue that each of Defendant's photo licenses is a distinct product (and therefore a new publication) because the details of the licenses are tailored to each individual purchaser. (Opp. at 5–8.) Plaintiffs contend that each individual license is a unique product akin to the authentication certificates at issue in *Miller*. According to Plaintiffs, because each sale of a photo license is a separate transaction involving a customized license, each sale constitutes a new publication for purposes of the statute of limitations. (*Id.*)

Plaintiffs' argument fails as a matter of both fact and law. There is no evidence in the record supporting Plaintiffs' argument that each of Defendant's customers obtains a unique product. Rather, the undisputed evidence shows that Defendant sells an *identical license* to each customer. (SUF 7–8, 11.) Plaintiffs' evidence merely shows that Defendant charges a *different price* to each customer. (SUF 5–8, 11; Gold Decl., Ex. 1 (containing deposition of a Corbis employee explaining Corbis's pricing structure).) The record shows that Defendant sets its prices by inquiring about the customer's intended uses. Defendant then charges a price based on the customer's likely ability to pay and need for the photograph (among other considerations). (SUF 5–8, 11; Gold Decl., Ex. 1 (Green Depo.).) In other words, the evidentiary record contains no evidence to contradict Defendant's showing that each license is exactly identical. (*See* SUF 7–8, 11.) Plaintiffs fail to identify any evidence that would refute this conclusion and present a triable issue of fact.

Additionally, Plaintiffs lack legal support for their argument that each sale of a license restarts the statute of limitation period even if each license is different. Plaintiffs' claims are based on the content of the images posted on Defendant's website, not the content of the licenses between Defendant and its customers. The allegedly infringing publication is Defendant's website, not Defendant's contracts. Under Plaintiffs' novel theory, the overstocked book publisher in the seminal *Gregoire* case would have been liable if it negotiated a new contract when selling its remainders. Indeed, under Plaintiffs' theory, every time a publisher enters into a distinct contract with a distributor, the publisher's actions have re-started the statute of limitations. This theory is unsupported in the caselaw and runs afoul of the basic principles behind the first publication rule.

In the most analogous case on point, *Yeager v. Bowlin*, the court held that the use of a person's name or likeness in connection with internet-based product sales constitutes a single publication rather than a series of re-publications that starts the limitations period anew with each individual sale. *Yeager v. Bowlin*, 2010 WL 95242. The plaintiff in that case (the well-known test pilot Chuck Yeager) sued the defendants for, among other things, using the plaintiff's name and image on defendants' website. The website was geared toward "marketing aviation memorabilia and providing aviation related news and information." *Yeager*, 2010 WL 95242, at *12. The court explained that the website "does not display different individualized content to different consumers, but rather displays

an identical set of content to all viewers of its website." *Id.* at *13. The continual display was functionally equivalent to the well-established rule that "the repeated sale of identical products is subject to the single publication rule." *Id.* Accordingly, the court held that the plaintiff's claims against the defendants had accrued at the time the allegedly infringing content was posted on defendants' website. *Id.* at *13–14.

The present case is exactly like *Yeager.* Defendant created its website and posted the allegedly infringing images and photo captions prior to August 2007. (SUF 2–5, 9.) The allegedly infringing images and captions have not been altered in any way since August 2007. (SUF 3–4.) Like the website in *Yeager,* Defendant's website "does not display different individualized content to different consumers, but rather displays an identical set of content to all viewers of its website." *Yeager,* 2010 WL 95242, at *13. Accordingly, the single publication rule applies and the statute of limitations begins to run from the time that the content was first posted on the internet.

Plaintiffs' publicity rights claims are time-barred by California's two-year statute of limitations. Cal. Civ.Code § 3425.3.[10]

## B. UNJUST ENRICHMENT

■ Plaintiffs' sole remaining legal argument is that the statute of limitations on the unjust enrichment cause of action begins to run from the time of each act that unjustly enriches Defendant. Under this theory, Defendant is unjustly enriched each time it sells a copyright license for one of Plaintiffs' images, and the statute of limitations begins to run at the time of each individual sale.

Plaintiffs' argument, if accepted, would completely eviscerate the first publication rule. The central justification for the first publication rule is that "[a] publisher that prints and distributes an issue of a maga-

10. Plaintiffs develop the foregoing arguments in a subsection of their Opposition entitled "The End User Republishes the Corbis Image." (Opp. At 5.)

Plaintiffs' section heading appears to raise a new theory of the case by suggesting that Defendant may be legally responsible for its users' conduct. Out of an abundance of caution, Defendant addresses this theory on the merits.

Plaintiffs' new theory is not alleged in the Complaint nor is it raised in any of Plaintiffs' briefs filed in connection with the two previous substantive motions. It is true that the "addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint." *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994) (citing *Roberts v. Arizona Bd. Of Regents,* 661 F.2d 796, 798 n. 1 (9th Cir. 1981)). However, Plaintiffs have not attempted to introduce any evidence or legal authority to support this new theory of the case. Therefore, to the extent that Plaintiffs discuss Defendant's user's conduct, the Court refrains from construing this brief reference as a re-

quest for leave to amend the Complaint. Even if the Court construed the reference as a request for leave to amend, that request would be denied because Plaintiffs have shown no reason for their delay in raising this argument and Defendant would suffer significant prejudice if Plaintiffs were allowed to amend their Complaint at this point in proceedings. *See Eminence Capital, L.L.C. v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir.2003) (discussing factors to consider when deciding whether to grant leave to amend a complaint). Furthermore, even if the matter were properly included in the Complaint, Plaintiffs have identified absolutely no evidence in the record that supports their contention that "The End User Republishes the Corbis Image." *See Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548.

Thus, while Defendant has addressed this issue at some length in its Reply (Reply at 4–5), and while the Court fully concurs with Defendant's analysis, the Court concludes that Plaintiffs have not properly raised this matter and no further analysis is necessary.

zine or an edition of a book is entitled to repose from the threat that a copy of that magazine or book will surface years later and trigger a lawsuit." *Christoff,* 47 Cal.4th at 481, 97 Cal.Rptr.3d 798, 213 P.3d 132.

■ Under Plaintiffs' unjust enrichment theory, "a new publication of the defamation could occur if a copy of the newspaper or book were preserved for many years and then came into the hands of a new reader. The statute of limitations could be tolled indefinitely, perhaps forever, under this approach." *Christoff,* 47 Cal.4th at 478, 97 Cal.Rptr.3d 798, 213 P.3d 132 (internal quotations omitted). As noted by the California Supreme Court, the single publication rule was created for the exact purpose of "correct[ing] these problems" that arise from the unlimited tolling of the statute of limitations. *Id.* at 478, 97 Cal. Rptr.3d 798, 213 P.3d 132. Instead, the single publication rule "hold[s] that, for any single edition of a newspaper or book, there was but **a single potential action** for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed." *Id.* (internal quotations omitted). That "single [cause of] action" accrues at the time the book or writing is first distributed, not when the book or writing is sold to a down-stream consumer. *See id.*

Plaintiffs cite to a single case to support their unjust enrichment theory: *First Nationwide Savings v. Perry,* 11 Cal.App.4th 1657, 15 Cal.Rptr.2d 173 (1992). It is true, as Plaintiffs point out, that the *First Nationwide Savings* court held that the statute of limitations on the plaintiffs' unjust enrichment claim began to run from the time that their property was sold to a third party. *Id.* at 1670, 15 Cal.Rptr.2d 173.

Upon a closer reading, however, *First Nationwide Savings* actually supports **Defendant's** position rather than **Plaintiffs'**.

The *First Nationwide Savings* court implicitly applied the well-established rule, cited throughout Defendant's briefs (and ignored in Plaintiffs'), that the court looks to the "gravamen" of the complaint and "the nature of the rights sued upon" to determine the appropriate statute of limitations. (Reply at 8–9, citing *Sahadi v. Scheaffer,* 155 Cal.App.4th 704, 712, 714–15, 66 Cal.Rptr.3d 517 (2007); *Rivas v. Safety–Kleen Corp.,* 98 Cal.App.4th 218, 229, 119 Cal.Rptr.2d 503 (2002).) *See also Hydro–Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Associates, Inc.,* 115 Cal. App.4th 1145, 1153, 10 Cal.Rptr.3d 582 (2004) ("To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action. The nature of the right sued upon and not the form of action nor the relief demanded determines the applicability of the statute of limitations under our code. What is significant for statute of limitations purposes is the primary interest invaded by defendant's wrongful conduct.") (internal citations, quotations, and alterations omitted). Applying this rule to the case before it, the *First Nationwide Savings* court borrowed the statute of limitations governing actions for quasi-contract and money had and received. *First Nationwide Savings,* 11 Cal. App.4th at 1670, 15 Cal.Rptr.2d 173. That outcome was an obvious one given that the plaintiffs' "unjust enrichment" cause of action was analogous to a quasi-contract cause of action.

Contrary to Plaintiffs' assertions, the *First Nationwide Savings* court *did not* hold that all unjust enrichment causes of action are governed by a three-year statute of limitations that accrues upon the date that the wrongful act takes place. Rather, the court implicitly held that unjust enrichment causes of action are governed by the relevant statute of limitations

applicable to the central contentions in the complaint. *See id.; see also F.D.I.C. v. Dintino,* 167 Cal.App.4th 333, 351, 84 Cal. Rptr.3d 38 (2008) (rejecting argument that *First Nationwide Savings* establishes that all unjust enrichment claims accrue on the date of injury). In other words, *First Nationwide Savings* requires the court to determine the "gravamen" of the complaint and apply the appropriate analogous statute of limitations. *See, e.g., Hydro–Mill Co.,* 115 Cal.App.4th at 1153, 10 Cal. Rptr.3d 582.

Here, it is undisputed that the gravamen of the Complaint is Defendant's infringement of Plaintiffs' rights of publicity. Accordingly, the relevant statute of limitations is provided in Cal. Civ.Code § 3425.3, and as discussed *supra,* Plaintiffs' claims are time-barred under this statute of limitations. Plaintiffs' arguments, while creative, are unavailing.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Defendant shall submit a proposed final judgment within five days.

IT IS SO ORDERED.