[No. D058321. Fourth Dist., Div. One. Feb. 28, 2012.]

PACIFIC RIM MECHANICAL CONTRACTORS, INC., Cross-complainant and Appellant, v.
AON RISK INSURANCE SERVICES WEST, INC., et al., Cross-defendants and Respondents.

---

Counsel

Solomon, Ward, Seidenwurm & Smith, Richard E. McCarthy, Thomas F. Landers and Heather N. Stone for Cross-complainant and Appellant.

King & Spalding, Paul R. Johnson, Geoffrey M. Ezgar and Leo Spooner III for Cross-defendants and Respondents.

---

Opinion

**NARES, J.**—In this case we are presented with an issue of first impression in California: Does an insurance broker, after procuring a policy of insurance for a developer on a construction project, owe a duty to apprise a subcontractor that was later added as an insured under that policy of the insurance company's subsequent insolvency? We conclude that, absent the assumption of a contractual duty to do so, insurance brokers owe no such duty.

Cross-complainant Pacific Rim Mechanical Contractors, Inc. (PacRim), appeals from a judgment entering dismissal of its cross-complaint against cross-defendants Aon Risk Insurance Services West, Inc., and Aon Reed Stenhouse, Inc. (together, Aon), after sustaining Aon's demurrer to all causes of action PacRim asserted against it. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Because we are reviewing a judgment following the sustaining of a demurrer, we take the factual background largely from PacRim's cross-complaint against Aon and Bosa Development California, Inc.

### A. The Construction Project and Insurance

The underlying litigation relates to a construction project (the project) in downtown San Diego, which was completed in 2002. In June 1999 the project's developer, cross-defendant Bosa Development California, Inc. (Bosa),[1] engaged Aon as its insurance broker to obtain insurance for the project. Aon procured a general liability insurance policy (the policy) for the project with Legion Indemnity Company (Legion) at the request of its client, Bosa. Legion was solvent at the time it issued the policy.

In 2000 Bosa hired PacRim as one of several subcontractors to work on the project. The parties entered into a contract (the contract) in which Bosa

---

[1] Bosa is not a party to this appeal.

agreed to provide PacRim with liability insurance through the policy for its work on the project. Aon, however, was not a party to the contract and PacRim was never its client.

The policy was a unified blanket insurance policy known as an owner controlled insurance program (OCIP) that provided liability insurance for every contractor and subcontractor on the project. The OCIP provided up to $25 million in liability coverage for 10 years after the construction was completed—the duration of California's 10-year construction defect statute of limitations.

PacRim became an enrolled party in the OCIP by contacting Aon and providing all necessary paperwork, and in October 2000 Aon provided PacRim with a "Certificate of Liability Insurance," identifying PacRim as an insured, and Legion as the primary insurer.

In April 2002, during the construction project, the Illinois Department of Insurance obtained an order of conservation against Legion. In 2002, the construction project was completed.

In April 2003, after the project was complete, the Circuit Court of Cook County, Illinois, entered an order of liquidation with a finding of insolvency against Legion.

In April 2002 Aon informed Bosa that Legion had been placed into rehabilitation. However, according to PacRim, neither Bosa nor Aon notified PacRim of Legion's financial condition. PacRim alleges that had Bosa or Aon informed it of Legion's "financial condition" PacRim "could and would have immediately suspended work and insisted that Bosa obtain alternative insurance coverage for the Project."

B. *The Construction Defect Lawsuit and PacRim's Cross-complaint*

In May 2009 the project's homeowners association filed a complaint for construction defects against Bosa and its subcontractors, including cross-complainant PacRim.[2] Bosa filed a cross-complaint against PacRim (and its other subcontractors) seeking indemnity. PacRim then filed a cross-complaint against Bosa and Aon for declaratory relief, breach of contract, negligence, fraudulent concealment, and negligent concealment. As against Bosa, PacRim alleged that Bosa breached the contract by failing to provide and maintain insurance as required by the contract. PacRim further asserted that Bosa

---

[2] The facts of the underlying action are omitted because they are not relevant to the issues raised on appeal.

breached the contract by "failing to provide the required written notice of a modification or discontinuation of the required coverage."

As against Aon, PacRim asserted that it "owed a duty of reasonable care to procure and maintain [the insurance policy] in PacRim's favor," which Aon breached by negligently or intentionally failing to disclose "Legion's deteriorating financial condition and eventual insolvency." Thus, PacRim explains its "claims against [Aon] are negligence based, not contract based."

Aon demurred to all of PacRim's causes of action, alleging (1) PacRim expressly asserted in its cross-complaint it was not a party to the contract and thus Aon had no liabilities to it and (2) even if PacRim were a party to the contract, PacRim (a) waived all rights of recovery against Aon for any coverage limitation or failure in the contract, and (b) Aon had no affirmative duty to notify PacRim of Legion's insolvency postissuance of the policy.

The trial court sustained Aon's demurrer with 10 days' leave to amend. The trial court found it "unnecessary to impose" on Aon a "duty to notify an insured of an insurer's post-issuance insolvency" because (1) Bosa was contractually obliged to notify PacRim of Legion's insolvency and (2) *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116 [100 Cal.Rptr.2d 246] (*Kotlar*), which "addresses the issue of a broker's duty," was analogous and controlling. The court cited *Kotlar* for the proposition that the duty of a broker is " 'to use reasonable care, diligence, and judgment in procuring the insurance requested by its client.' " The court went on to note that PacRim "fails to provide California authority imposing on a broker a duty to notify an insured of an insurer's post-issuance insolvency" and declined to impose such a duty.

The court entered a judgment of dismissal of PacRim's cross-complaint against Aon because it sustained the demurrer as to all of the causes of action. PacRim elected to file this appeal instead of amending its cross-complaint.

## DISCUSSION

### I. *STANDARD OF REVIEW*

We review de novo an order sustaining a demurrer. (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1153 [121 Cal.Rptr.3d 819].) Thus, our " ' " 'only task in reviewing a ruling on a demurrer is to determine whether the complaint states a cause of action [as a matter of law].' " ' " (*Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 824 [121 Cal.Rptr.2d 703].) We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985)

39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Accordingly, a complaint survives demurrer if it alleges facts sufficient to state a cause of action under any possible legal theory. (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 219 [86 Cal.Rptr.2d 209].)

## II. THE TRIAL COURT DID NOT ERR IN SUSTAINING THE DEMURRER

On appeal, PacRim asserts the trial court erred in concluding its causes of action against Aon fail as a matter of law because Aon did not have a duty to inform PacRim of Legion's insolvency. We conclude Aon did not have a duty to inform PacRim of Legion's postissuance insolvency. Accordingly, we affirm the trial court's judgment.

### A. Aon Had No Duty to Inform PacRim of Legion's Insolvency

Insurance brokers owe a limited duty to their clients, which is only "to use reasonable care, diligence, and judgment in *procuring* the insurance requested by an insured." (*Jones v. Grewe* (1987) 189 Cal.App.3d 950, 954 [234 Cal.Rptr. 717], italics added; see *Kotlar, supra*, 83 Cal.App.4th at p. 1123.) Accordingly, an insurance broker does not breach its duty to clients to procure the requested insurance policy unless "(a) the [broker] misrepresents the nature, extent or scope of the coverage being offered or provided . . . , (b) there is a request or inquiry by the insured for a particular type or extent of coverage . . . , or (c) the [broker] assumes an additional duty by either express agreement or by 'holding himself out' as having expertise in a given field of insurance being sought by the insured." (*Fitzpatrick v. Hayes* (1997) 57 Cal.App.4th 916, 927 [67 Cal.Rptr.2d 445].)

California law is well settled as to this limited duty on the part of insurance brokers. (*Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1153 [10 Cal.Rptr.3d 582] [insurance brokers owe a duty to procure the requested insurance]; *Nowlon v. Koram Ins. Center, Inc.* (1991) 1 Cal.App.4th 1437, 1447 [2 Cal.Rptr.2d 683] ["the duty of the broker . . . is incurred in the procurement or issuance of an insurance policy . . ."]; see also *Wilson v. All Services Ins. Corp.* (1979) 91 Cal.App.3d 793, 798 [153 Cal.Rptr. 121] [holding that a broker has no duty to investigate the financial condition of insurer authorized to conduct business when policy issued].)

PacRim does not allege that Aon failed to use reasonable care in procuring the insurance policy from Legion. Moreover, PacRim does not allege that Aon assumed any additional contractual duties beyond procuring the insurance. Rather, PacRim is asking this court to create a new legal duty of

notification of "Legion's conservation order and insolvency" after the policy is procured, and to apply that retroactively upon Aon. As we shall explain, we decline to impose such a new duty.

*Kotlar, supra,* 83 Cal.App.4th 1116, is analogous to the issue presented in this case, and, we conclude, persuasive. In *Kotlar,* the issue presented was whether an insurance broker has a common law duty to give notice to an insured of discontinued coverage after the broker properly placed the policy. (*Kotlar, supra,* 83 Cal.App.4th at p. 1123.) The plaintiff in *Kotlar,* like PacRim, was insured under a policy procured by the defendant insurance broker at the request of another party. (*Id.* at p. 1119.) There, the tenant maintained an insurance policy naming the landlord Kotlar as an insured pursuant to the tenant's lease, and, like PacRim in this case, Kotlar received a certificate of insurance from the broker. (*Ibid.*) The plaintiff insured, Kotlar, sought to impose liability on the broker for its alleged failure to notify Kotlar that the insurer intended to cancel the policy for nonpayment of premiums, which rendered Kotlar without coverage when a later loss occurred. (*Ibid.*)

The *Kotlar* trial court sustained the insurance broker's demurrer that the negligence claim failed as a matter of law, finding the broker owed no duty to notify the insured that the policy was being cancelled. (*Kotlar, supra,* 83 Cal.App.4th at pp. 1119–1120.) The Court of Appeal upheld this ruling. In doing so, the court noted "Kotlar cites no case holding an insurance broker owes a duty . . . to provide . . . notice . . . . Instead, he asks us to create such a duty. We decline to do so for several reasons." (*Id.* at p. 1123.) The court first noted that because Insurance Code section 677.2 "imposes a duty on the insurer to notify the named insureds of its intent to cancel the policy we see no purpose in judicially imposing such a duty on a broker." (*Kotlar, supra,* at p. 1123.) The court also concluded, "[T]he relationship between an insurance broker and its client is not the kind which would logically give rise to such a duty. The duty of a broker, by and large, is to use reasonable care, diligence, and judgment in *procuring* the insurance requested by its client." (*Ibid.,* italics added.) Finally, the *Kotlar* court distinguished a broker-client relationship from an attorney-client relationship, which is fiduciary in nature. (*Ibid.*)

As in *Kotlar,* Aon had no legal duty to provide notice of the discontinuation of coverage caused by Legion's insolvency. PacRim does not allege that Aon failed to use reasonable care in procuring the policy in question. Rather, like the plaintiff in *Kotlar,* PacRim seeks to impose upon brokers a new legal duty of notification *after* the policy has been procured, to an insured that has a certificate of insurance, of the insolvency of an insurance company. That duty, as explained in *Kotlar,* under Insurance Code section 677.2 rests with the insurer. Additionally, as we shall explain, *post,* according to PacRim's own allegations, that duty rested with Bosa. Because

PacRim's claims are based entirely on the allegation that Aon failed to satisfy a duty that California law does not recognize and that the Court of Appeal rejected in *Kotlar*, PacRim's claims against Aon fail as a matter of law.

B. *Public Policy Supports the Conclusion There Is No Duty to Notify of Insolvency*

We are further disinclined to retroactively impose on Aon (and all other insurance brokers) the duty PacRim asks us to impose because of considerations of public policy. We agree with Aon that imposition of a duty requiring insurance brokers to inform an insured of "any adverse changes in the carrier's financial capability" postissuance of the insured's policy is properly the function of the Legislature because it would (a) fundamentally alter the nature and corresponding duties of insurance brokers, which would (b) increase the costs of procuring insurance.

" '[W]hether, and the extent to which a new duty is recognized is a question of public policy.' " (*Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1451 [92 Cal.Rptr.2d 521].)

We first must note that, contrary to its assertion on appeal, PacRim is not merely seeking to impose a narrow duty on the part of brokers to notify an insured when it has actual knowledge of an insurer's insolvency that "would impose almost no burden on brokers." The very facts alleged in PacRim's cross-complaint dispel this notion. PacRim alleges that if it had been notified it would have suspended work and demanded that Bosa obtain alternative insurance. This duty, according to PacRim, must have arisen in 2002, when the Illinois Department of Insurance obtained an order of conservation against Legion, as, according to PacRim's cross-complaint, Legion was not declared insolvent until 2003, *after* the project was completed. However, an order of conservation does not necessarily mean an insurance company is insolvent. Insurance Code section 1011 provides that an order of conservation may be sought against an insurance company upon a showing: "(a) That such person has refused to submit its books, papers, accounts, or affairs to the reasonable inspection of the commissioner or his or her deputy or examiner. [¶] (b) That such person has neglected or refused to observe an order of the commissioner to make good within the time prescribed by law any deficiency in its capital if it is a stock corporation, or in its reserve if it is a mutual insurer. [¶] (c) That such person, without first obtaining the consent in writing of the commissioner, has transferred, or attempted to transfer, substantially its entire property or business or, without such consent, has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person. [¶] (d) That such person is found, after an examination, to be in such

condition that its further transaction of business will be hazardous to its policyholders, or creditors, or to the public. [¶] (e) That such person has violated its charter or any law of the state. [¶] (f) That any officer of such person refuses to be examined under oath, touching its affairs. [¶] (g) That any officer or attorney in fact of such person has embezzled, sequestered, or wrongfully diverted any of the assets of such person. [¶] (h) That a domestic insurer does not comply with the requirements for the issuance to it of a certificate of authority, or that its certificate of authority has been revoked; or [¶] (i) That the last report of examination of any person to whom the provisions of this article apply shows such person to be insolvent . . . ."

Moreover, after an order of conservation is obtained, the insurance company may challenge the order by proving that the grounds alleged for the conservation do not exist or have been removed. (Ins. Code, § 1012.) A "conservatorship proceeding . . . contemplates, not the liquidation of the company involved, but a conservation of the assets and business of the company over the period of stress by the commissioner who thereafter yields the control and direction to the regular officers of the company." (*Caminetti v. Superior Court* (1941) 16 Cal.2d 838, 843 [108 P.2d 911].)

Illinois law, under which a conservation order was obtained against Legion, is similar: "Pursuant to an Order of Conservation, the [Illinois Director of Insurance] takes possession of property, business and affairs of a company to protect the interests of policyholders and other creditors, and proceeds to ascertain the condition and situation of the company." (Ill. Div. of Insurance, Off. of Special Deputy Receiver, 2003 Ann. Rep., p. 37.) That was done in Legion's case in April 2002. (*Id.* at p. 46.) Legion contested that order and it was not until after one year of court proceedings that Legion was declared insolvent and placed in liquidation in April 2003. (*Ibid.*)

Thus, according to PacRim's own allegations in this case, it is asking brokers to notify an insured not just of an actual insolvency of an insurer, but of any adverse changes in its financial condition because an order of conservation is not necessarily an adjudication that an insurer is insolvent. Indeed, the cross-complaint alleges that Aon had a duty to notify PacRim not just of Legion's insolvency, but its "deteriorating financial condition." This necessarily imposes a duty of monitoring and presents brokers with uncertainty as to when the notification duty arises. We decline to impose such a duty that fundamentally changes the relationship between brokers and their insureds.

Further, the Legislature has already statutorily imposed a number of duties on insurers and insurance brokers. (See, e.g., Ins. Code, §§ 785, 1732, 10089.23, 10113.2, subd. (d)(13), 10119.3, 10192.55, 10234.8.) We decline to

impose a new duty on insurance brokers as PacRim requests us to do because "[i]f it is in the interest of the public . . . , the people of California, by initiative or through the Legislature, can create that duty . . . ." (*Schimmel v. NORCAL Mutual Ins. Co.* (1995) 39 Cal.App.4th 1282, 1286 [46 Cal.Rptr.2d 401].) "We may not legislate on the subject in their stead." (*Id.* at p. 1283.)

Moreover, as discussed, *ante*, imposing on insurance brokers " 'a continuing duty to apprise [insureds] of any adverse changes in the [insurer's] financial capability' " as PacRim urges would significantly expand and redefine a broker's role. The duty PacRim seeks us to impose on brokers is unpredictable because what constitutes an adverse change in the insurer's financial capability that triggers the duty to notify the insured is exceedingly ambiguous. The scope of such a standard would take an unknown amount of time to define. The costs necessary to determine its exact scope through litigation, as well as the costs for brokers to effectively perform the duty, would be substantial. Further, because PacRim asks us to impose the duty retroactively, every insurance broker that failed at any time to advise any claimant under a policy it brokered of any adverse change in the insurer's financial capability faces liability. These concerns reinforce our conclusion that imposing the duty on insurance brokers as PacRim requests is properly the role of the Legislature, not the courts. (See *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71 [78 Cal.Rptr.2d 16, 960 P.2d 1046] [holding "the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state"].)

Indeed, as PacRim acknowledges, at least 10 states and Puerto Rico have elected to impose a *statutory* duty to notify an insured of a subsequent insolvency as soon as the agent or broker receives notice of that insolvency. (See Sinder et al., Agent/Broker Liability for Insurer Insolvency (4th ed. 2006) pp. 3, 10 <https://www.ciab.com/WorkArea/DownloadAsset.aspx?id=1043&libID=1064> [as of Feb. 27, 2012].) California has chosen not to enact such legislation. We decline to create such a duty where our Legislature could have done so, but has not.

Further, if anyone had a duty to inform PacRim of Legion's insolvency, it was Legion. (See Ins. Code, § 677.2, subds. (b) & (c) [requiring insurers inform insured of intent to cancel in writing with at least 30 days' advance notice].)

Moreover, creating such a new duty could expose brokers to personal liability for claims made against them by insureds. In most agents' and brokers' errors and omissions (E&O) policies there is an exclusion for claims made by an insured because the insurer with which the agent or broker placed coverage is unable to pay an otherwise covered claim because of the

insurer's insolvency. For example, in *Barron v. Scaife* (La.Ct.App. 1988) 535 So.2d 830, an insurance agent was accused of failing to notify its insured of the insurance company's insolvency. The court held that an exclusion in the agent's E&O policy for " 'claims made against the insured arising from or related to: [¶] . . . [¶] . . . [t]he insolvency, receivership, bankruptcy or liquidation of any insurance company' " applied and found no coverage for the claim made by the insured against the agent. (*Id.* at p. 832; see also *Transamerica Ins. Co. v. Snell* (Fla.Dist.Ct.App. 1993) 627 So.2d 1275, 1276–1277; *St. Paul Fire & Marine Ins. Co. v. Cohen-Walker, Inc.* (1984) 171 Ga.App. 542 [320 S.E.2d 385].)

Imposing continuing duties of monitoring and notification upon the broker after issuance of the policy creates other practical difficulties. In the case of occurrence-based policies, the proposed common law notification duty could last indefinitely, well after brokers (and the client) may have ceased doing business. For example, in this case the Legion policy extended 10 years after completion of the project in 2002, more than 13 years after the policy was procured in 1999. We decline to impose such a new, continuing duty retroactively against brokers. We reiterate that adoption of the rule advocated by PacRim should be done prospectively by the Legislature to avoid uncertainty as to the duties of brokers in this state.

### C. *Bosa's Contractual Duty to Inform PacRim of Insolvency*

Aon contends, and the trial court agreed, Bosa had a contractual duty to inform PacRim of Legion's insolvency. "10.3.2(g) CONTRACTOR'S ELECTION TO MODIFY OR DISCONTINUE [THE POLICY] [Bosa] may, for any reason, modify the [policy], discontinue [the policy], or request that [PacRim] or any of its Subcontractors withdraw from the [policy] upon thirty (30) days written notice."

Based upon this language PacRim alleges in its cross-complaint that Bosa had a contractual duty to notify it of Legion's insolvency, and breached the contract by failing to do so. We must accept these allegations as true for the purposes of reviewing the court's order sustaining Aon's demurrer. (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.) As the court found, because Bosa had a contractual duty to inform PacRim of Legion's insolvency, there was no need to create a new duty on the part of Aon to also inform PacRim of Legion's insolvency.

### D. *PacRim's Citation to Out-of-state Authorities Is Misplaced*

PacRim asserts we should "join with every other state to consider the issue by recognizing an insurance broker's duty to share its actual knowledge of the insurer's insolvency with the insured." This contention is unavailing.

First, this statement is simply incorrect. In fact, several states have refused to impose such a duty upon a broker after it has procured the insurance policy.

For example, in *Williams-Berryman Ins. Co. v. Morphis* (1971) 249 Ark. 786 [461 S.W.2d 577], the Arkansas Supreme Court dismissed a policyholder's claim against an insurance broker for negligence based on the subsequent insolvency of the carrier. The court held that a broker has no duty to provide notice of an insolvency of the insurer that occurs after the policy is placed. (*Id.*, 461 S.W.2d at p. 580.) Rather, the broker's only relevant duty was to exercise reasonable care to procure insurance from an insurer that was solvent at the time the policy was placed, which the broker had done. (*Ibid.*)

In *Beckman v. Edwards* (1910) 59 Wn. 411, 413 [110 P. 6], the Supreme Court of Washington dismissed a similar complaint against a defendant independent insurance agent, holding: "Where an agent provides a policy in a company which is solvent or generally considered so, he is not personally liable for a loss which occurs when the company subsequently becomes insolvent." (See also *Sternoff Metals Corp. v. Vertecs Corp.* (1984) 39 Wn.App. 333 [693 P.2d 175, 180] [granting summary judgment to defendant broker because broker owed no duty to client after placing coverage with a surplus lines insurer that was solvent at the time (citing *Beckman, supra,* 110 P. 6)].)

Vermont and Maine have also held that brokers have no duty to give notice to an insured of a cancellation of a policy postissuance: "The duty of an insurance agent is to use reasonable care and diligence to procure insurance that will meet the needs and wishes of the prospective insured, as stated by the insured. [Citation.] Absent special facts not present here, it is generally well settled that once a policy has been procured as requested, the relationship terminates and no further duty is owed the insured by the insurance agent in respect to such insurance. [Citation.] Specifically, where an insurance company is required to give direct notice of cancellation to the insured, as is the case here, the insurance agent is not liable for a failure to notify, since he is justified in assuming that the insured would be made aware of the cancellation from other sources." (*Rocque v. Co-operative Fire Ins. Assn.* (1981) 140 Vt. 321 [438 A.2d 383, 386] [dismissing negligence claim against independent insurance agent in the position of a broker for failure to notify the insured of the policy's cancellation, resulting in no coverage]; *Sunset Enterprises v. Webster & Goddard, Inc.* (Me. 1989) 556 A.2d 213, 215 [same].)

In *Eastham v. Stumbo* (1929) 212 Ky. 685 [279 S.W. 1109, 1110], the court stated, "We have been referred to no authority holding an insurance agent

liable to the policyholder where the company subsequently becomes insolvent and the agent fails to notify the policyholder of the insolvency of the company. We do not well see upon what legal principle such a duty would rest. This would require an agent to notify all those holding policies in the company through him, and would impose on him a duty not in the interests of the company, which might require of him action that would justly be deemed by the company a breech of his duties to it. No man can serve two masters."

Further, in all but one case, in the out-of-state cases PacRim relies upon to support such a duty, the plaintiff insured was the broker's *client*. (See *AYH Holdings, Inc. v. Avreco, Inc.* (2005) 357 Ill.App.3d 17 [292 Ill.Dec. 675, 826 N.E.2d 1111, 1132] [" 'Assuming that a broker is on notice that an insurance company is insolvent, he or she has an affirmative duty to notify the *client* of the fact.' " (italics added)]; *Kinder Mortgage Co. v. Celestine* (La.Ct.App. 1994) 635 So.2d 527, 529 [" 'the general principles of the fiduciary relationship . . . [hold that] an independent broker has an affirmative duty to inform *the client* of a premature termination of the coverage' " (italics added)]; *Glenn v. Leaman & Reynolds, Inc.* (La.Ct.App. 1983) 442 So.2d 1224, 1226 [an "independent broker has an affirmative duty to inform *the client* . . ." (italics added)]; *Hobbs v. Midwest Ins.* (1997) 253 Neb. 278 [570 N.W.2d 525, 528] ["The evidence indicates that in January 1990 [the insurance agent] met with [the client] to discuss the proposed changes to the policy."]; *Cateora v. British Atlantic Assurance, Ltd.* (S.D.Tex. 1968) 282 F.Supp. 167, 174 [the "duty of an insurance agent [is] to inform *his clients* when said agent knew that the insurer had become insolvent, or to replace the insurance" (italics added)]; *Higginbotham & Associates, Inc. v. Greer* (Tex.App. 1987) 738 S.W.2d 45, 48 (*Higginbotham*) [plaintiff client spoke directly with employees of the defendant insurance agency regarding the type of coverage needed to insure his business and specifically requested that the insurance policy be procured].)

■ Although PacRim was an insured, and was given a certificate of insurance, it was not Aon's client. Bosa was. An insurance broker's client is the person or entity that contracts with the broker, communicates to the broker its insurance needs, reviews the quotes provided by the broker and decides what policy to purchase. The minimal contact between Aon and PacRim, that occurred over a year *after* Aon procured the policy on behalf of Bosa, also supports a finding of no duty on the part of Aon to notify the subcontractor insureds. Thus, these cases are not persuasive in deciding the issue presented in this case.

*Higginbotham, supra*, 738 S.W.2d 45, upon which PacRim heavily relies, is particularly inapposite. There, the claim was that the insurance agent failed

to exercise reasonable care in *procuring* an insurance policy where the insurance company later became insolvent. The *Higginbotham* court found that the agent exercised reasonable diligence in obtaining insurance from the carrier inasmuch as nothing indicated at the time that the carrier was an unreasonable risk. Therefore, the agent was not negligent. (*Id.* at p. 48.)

In so holding, the court stated, "The general rule is that an insurance agent or broker is not a guarantor of the financial condition or solvency of the company from which he obtains the insurance. He is required, however, to use reasonable skill and judgment with a view to the security or indemnity for which the insurance is sought, and a failure in that respect may render him liable to the insured for resulting losses." (*Higginbotham, supra,* 738 S.W.2d at p. 46.) As such, "where the company was solvent when the policy was procured, its subsequent insolvency generally does not impose liability on the agent or broker." (*Id.* at pp. 46–47.)

There was no issue raised in *Higginbotham* as to an agent's duty to *notify* an insured of an insurer's insolvency that occurs *after* the policy is procured. However, PacRim cites the following language from that case for the proposition that Aon had such a duty: "[A]n agent is not liable for an insured's lost claim due to the insurer's insolvency if the insurer is solvent at the time the policy is procured, unless at that time *or at a later time when the insured could be protected*, the agent knows or by the exercise of reasonable diligence should know, of facts or circumstances which would put a reasonable agent on notice that the insurance presents an unreasonable risk." (*Higginbotham, supra,* 738 S.W.2d at p. 47, italics added.) The italicized portion of that sentence was dicta, as the issue of a continuing duty to notify insureds of the postprocurement financial condition of an insurance company was not at issue in that case.

Moreover, because of the holding in *Kotlar*, which we have found dispositive, and principles of public policy, which we have discussed, *ante*, we decline to follow out-of-state authority that imposes a duty upon a broker to inform an insured, postprocurement, of an insurer's insolvency.

### E. *Biakanja v. Irving*

Finally, PacRim's contention *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16] (*Biakanja*) should control here is unavailing. In *Biakanja*, our Supreme Court established a test to determine when a defendant will be liable for negligent performance of a *contractual duty* to a party not in privity of contract with the defendant. (*Id.* at pp. 648–650.) However, as PacRim concedes, its "claims against [Aon] are negligence based, not contract based." PacRim contends Aon is liable in tort because Aon failed to inform PacRim

immediately of Legion's insolvency. Thus, PacRim does not assert Aon breached any contract, which renders *Biakanja* inapplicable here.

We conclude the trial court properly sustained Aon's demurrer because it had no duty as Bosa's insurance broker to inform PacRim of Legion's insolvency, and we are unwilling to extend that duty as PacRim requests. Because we conclude Aon did not owe any duty to PacRim, all of its causes of action necessarily fail. Accordingly, the trial court's judgment is affirmed.

## DISPOSITION

The trial court's judgment is affirmed. Aon shall recover its costs on appeal.

McConnell, P. J., and McIntyre, J., concurred.